**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0197n.06

Nos. 09-2222/09-2276

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED
Mar 30, 2011
LEONARD GREEN, Clerk**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| GABRIEL KISH, III, (No. 09-2222) | ) | DISTRICT OF MICHIGAN |
| DEBORAH SUMMERS, (No. 09-2276) | ) | |
| | ) | |
| Defendants-Appellants. | ) | **OPINION** |
| _____ | ) | |

Before: **MERRITT, ROGERS, and WHITE, Circuit Judges**.

**HELENE N. WHITE, Circuit Judge.** Defendants-Appellants Gabriel Kish III (Kish) and

Deborah Summers (Summers) were each convicted of one count of dealing in firearms without a

license in violation of 18 U.S.C. § 922(a)(1)(A). The district court sentenced Kish to 48 months'

imprisonment and Summers to 57 months' imprisonment, and both timely appealed. We **AFFIRM**.

**I. Background**

Kish first became involved in the gun business in 1956. He obtained a federal firearms

license (FFL) in 1966, and after working in several gun shops, decided to build a new gun store in

Highland, Michigan. Construction was completed in 1993.

On January 11, 1993, Kish applied for an FFL for his new store, the Highland Gun Barn

(Highland). Because Highland was officially owned and operated by Highland Gun Barn, Inc.,[1] Kish

_____

[1]Kish was the president of this entity.

needed to obtain a new FFL on behalf of the corporation. The application was granted on February 17, 1994, following the completion of the required inspection of Highland.[2]

ATF investigators conducted their first post-license-issuance inspection of Highland in March 2000. The investigators spoke to Kish and Summers, Kish's long-time significant other who helped run Highland and handled the bookkeeping for Highland. After reviewing Highland's records, the investigators found fourteen record-keeping violations, which included failing to timely record the disposition of firearms, failing to ensure proper completion of, and failure to retain, ATF Forms 4473, failing to identify a purchaser prior to the sale of a gun, and failing to record all of the firearm acquisition information. These violations were discussed with Kish and Summers at the time of the inspection, and on February 23, 2001, Kish was sent a formal warning letter documenting these infractions.

---

[2]A federal firearms dealer has several duties, among which are (1) keeping a set of records including an acquisition/disposition record book, in which the dealer must make a record any time a firearm is obtained with the purpose of including it in the business inventory and any time a firearm is sold from the inventory; (2) identifying purchasers and sellers by checking state-issued identification and noting this information in the record; (3) identifying purchasers on ATF Form 4473, which requires a purchaser to note his full name, residence, place of birth, height, and weight and to affirm that he is the actual purchaser of the firearm and that he is not disqualified from purchasing a firearm, and also requires the dealer to list his name and FFL number, and to answer questions regarding the purchaser's type of identification and the type, manufacturer, model, and serial number of the firearm being purchased.

A dealer is also required to call the toll-free number of the National Instant Check System (NICS), which is maintained by the FBI, and read the information from Form 4473 over the telephone to obtain a background check on the purchaser. All of these measures are designed to aid the Bureau of Alcohol, Tobacco, and Firearms (ATF) in tracing weapons that have been used to commit crimes. To that end, a dealer must respond to ATF's trace requests, allow ATF to make an annual inspection if ATF investigators come to the premises during business hours, and be in compliance with all state and local laws.

On May 6, 2001, ATF Industry Operations Investigator Vicki Kopcak (Kopcak) and another investigator conducted a follow-up compliance inspection of Highland. They first compared the physical inventory to the information in Highland's acquisition/disposition record book and found that two guns that had been recorded as sold were being displayed as inventory. The investigators also discovered that eighteen guns previously in inventory did not have a disposition record and were not located at Highland. Kish and Summers were issued violations for these infractions at the conclusion of the inspection. The investigators also reviewed Highland's 4473 forms that had been filled out in the fourteen months since the previous inspection. Kopcak noted some discrepancies on fifteen forms referring to multiple firearms purchases. After the inspection, Kopcak sent letters to the purchasers named on these forms to confirm that they did, in fact, purchase all the guns recorded on the forms. Thirteen of the fifteen responded; four of them said that they had purchased only the first gun listed on the form.

Because Kish had received a warning letter and new violations were found during an annual inspection conducted after receipt of the letter, Kish was required to attend a warning conference at the Detroit ATF office. On October 10, 2001, Kish and Summers, together with their lawyer at the time, Thomas Muller (Muller), met with Kopcak, the second investigator, and Kopcak's supervisor. The ATF representatives discussed the guns that were missing from Highland and the 4473 forms that improperly listed multiple gun purchases. At the conclusion of the conference, Kopcak asked Kish and Summers for permission to examine additional 4473 forms, but her request was denied. As a result, Kopcak applied for and obtained an administrative search warrant.

On October 29, 2001, Kopcak and another investigator went to Highland, presented the warrant to Kish, and looked through Highland's records. Kopcak located 108 forms that recorded multiple firearms sales. Approximately seventy of these forms looked suspicious and Kopcak sent letters to the named purchasers. Thirty-five responded and nine of them said that they had only purchased the first gun listed on the form. Because these reporting discrepancies constituted additional violations, Kopcak and another investigator returned to Highland on March 18, 2002 to hold a closing conference and discuss the infractions. They gave Kish and Summers until March 27, 2002 to correct the violations. A certified letter documenting the violations and the required corrective action was sent to Kish on March 20, 2002.

When no corrections were made, Kopcak recommended that Highland's license be revoked. Kopcak's supervisors reviewed and approved this recommendation. A notice of revocation of license was mailed and hand-delivered to Kish in mid-October 2002. The notice stated that Highland's license was being revoked because it had continually and wilfully violated the provisions of the Gun Control Act, 18 U.S.C. § 921.

When an FFL is revoked, the licensee is entitled to a revocation hearing before an unbiased ATF officer. On November 6, 2002, Muller requested a revocation hearing and, after some scheduling-related delays, the hearing was held on October 7, 2003 at ATF's Detroit office. In January 2004, the hearing officer issued a lengthy opinion upholding the revocation. Jacqueline Darrah (Darrah), Director of Industry Operations for Detroit, reviewed and affirmed the hearing officer's decision. Kopcak served a final notice of revocation on Highland on September 28, 2004.

According to Kopcak, when she gave the notice to Kish, he stated "well, we'll just have to play musical licenses, then."

Kish had sixty days to appeal the license revocation to an administrative law judge. Based on Muller's representations that Kish intended to retire and sell his business, Darrah allowed Kish to continue to dispose of his assets until February 7, 2005.[3] Kish's subsequent requests for further extensions were denied and Highland's FFL was officially revoked in February 2005. From this point onward, Kish properly could either transfer the firearms from Highland to a licensed dealer or transfer them to his own personal collection. He could sell guns from his personal collection, but he could not lawfully continue to buy and sell guns with the primary objective of livelihood and profit.

In 2006, Keith Williams (Williams), a convicted felon, stopped by Highland with Rich Schaffer (Schaffer), another convicted felon, to get directions. Once inside, Williams and Schaffer noticed that Highland was also a pawn shop and, after speaking with Summers, they traded brand

---

[3]On October 19, 2004, an asset purchase agreement was drawn up between the Highland Gun Barn, Inc. and GB2525 M-59, Inc. Gabriel Kish IV (Gabriel), Kish's son, was the president of GB2525 M-59, Inc. Although Gabriel was a licensed firearms dealer in Otisville, Michigan doing business at the Otisville Gun Barn (Otisville), he would need a new FFL to sell firearms at Highland. As a result, the agreement was contingent upon Gabriel's receipt of an FFL for Highland. Gabriel wrote a check to Kish in the amount of $70,000 as payment for Highland's assets. Kish cashed the check on October 19.

Otisville's records reflect that it received 674 firearms from Highland, which Kish contended constituted the entire inventory of Highland, approximately six months later in April 2005. Gabriel did apply for an FFL on behalf of GB2525 M-59, Inc. prior to the revocation of Highland's FFL. When Kopcak and another investigator interviewed Gabriel, however, he told them that "he would not withdraw the application, but he wanted [the investigators] to hold it up or deny the application." Gabriel ultimately withdrew his application in April 2005.

new MP3 players and cameras, which they had shoplifted, for a 12-gauge shotgun and an AR-15 assault rifle.

Williams returned to Highland approximately three more times in 2006 and 2007; on all but one of these occasions he was accompanied by Schaffer. Typically, Williams and Schaffer would give Kish and Summers items that they had shoplifted—often new and in the original box—and Kish and Summers would give them store credit in the amount of fifty percent of the cost of the shoplifted merchandise (based on the price tags). Williams and Schaffer used the store credit to buy firearms, obtaining approximately twelve guns in total. Neither was ever asked for his identification or to fill out any paperwork prior to acquiring a firearm.

In May 2007, Williams was arrested in Flint for carrying a concealed weapon and possession of a firearm by a convicted felon. In an effort to reduce his sentence, Williams told the police what he knew about Highland. Williams was referred to ATF Special Agent Darrell Logwood (Logwood), who interviewed Williams and asked him to make an undercover purchase of firearms from Highland. ATF agents provided Williams with some new merchandise and, on August 14, 2007, Williams went to Highland and traded this merchandise for $350 in store credit, which Williams used to purchase a shotgun and a .22 rifle. He dealt with Summers, who did not ask him for identification or to fill out any paperwork. Williams recorded the transaction on a concealed camera.

Logwood also directed ATF agents to make undercover purchases from Highland to determine whether Kish and Summers were simply selling off their old inventory or actively acquiring (or dealing in) firearms. On August 31, 2007, Williams and Paul Wade (Wade), a special agent with the ATF, went to Highland while outfitted with concealed cameras. Williams introduced

Wade to Summers as one of his friends. Williams and Wade brought along a new Toshiba laptop computer, which they exchanged for a Norinco SKS rifle. No paperwork was completed during this transaction, and Summers never asked for Wade's identification. At the conclusion of the transaction, Wade asked Summers if he could buy a handgun from her at a later date. Summers told Wade that he would have to go to her other store to do that. Wade also asked Summers whether she had gotten in more Norinco SKS rifles and she said that she had. Finally, Summers asked Williams and Wade to bring another laptop computer and a flat-screen television when they returned to Highland. This transaction concluded Williams's involvement in the investigation.

On September 7, 2007, Special Agent Wade returned to Highland while wearing a concealed recording device. He brought a new desktop computer and a flat-screen television and exchanged these items for a Russian SKS rifle. Wade also asked Summers if he could buy a handgun for approximately $400-450. Summers told him that "people who aren't on the up-and-up . . . can't get a pistol because [they] have to fill out the paperwork and [the gun] has to be registered." Wade and Summers agreed that Wade's girlfriend, who was over twenty-one years old, had no criminal record, and had already obtained a pistol-purchase permit, would be able to purchase this firearm. Summers said that she would get the firearm from Otisville and let Wade know when it was available for pick-up.

On September 13, 2007, Wade went to Highland with ATF Special Agent Tracy O'Neill (O'Neill) to pick up the handgun; both agents wore concealed recording devices. Wade introduced O'Neill to Summers as his girlfriend. Summers gave Wade a nine-millimeter handgun and instructed O'Neill to complete Form 4473. When O'Neill asked how she should respond to a

question asking whether she was purchasing the handgun for herself, Summers told her to answer in the affirmative although O'Neill was buying the gun for Wade. After O'Neill completed the paperwork, both she and Wade asked if they could buy another handgun, as O'Neill had two pistol-purchase permits. Summers stated that she happened to have some extra handguns, which she had brought from Otisville to raffle off at a National Rifle Association (NRA) banquet, and provided them with another nine-millimeter handgun. Wade and O'Neill paid $1,000 for both handguns.[4]

Before leaving, Wade asked Summers what he should say if anyone asked where he and O'Neill got the firearms; Summers responded that they should say they got them from Otisville. Wade also discussed future transactions and Kish and Summers provided him with a written list of items they desired to receive in exchange for firearms. Included on this list were various electronic items and appliances.

On October 12, 2007, Wade called Summers and told her that he had obtained a washer and dryer from Sears for her. Wade suggested that he take these items to Otisville because this location was more convenient for him, although in reality he wanted to determine whether the Otisville store was engaging in any illegal activity. Summers agreed to this arrangement and told Wade that if he picked out the gun he wanted in exchange for the washer and dryer at Otisville, she would bring it to Highland. Wade delivered the washer and dryer to Otisville and left them with Gabriel, Kish's son. Wade also picked out a Mossberg 500 pump-action shotgun with a pistol grip and called

---

[4]Each firearm cost $550. Because Wade only had $1000, Kish told him that he would "owe" them, while Summers observed that "we could always use something."

Summers from Otisville to tell her which firearm he had picked out. Summers stated that she would make arrangements to bring this firearm to Highland.

After Wade was unable to reach Summers by telephone, Wade decided to return to Highland with Special Agent O'Neill, who was still posing as his girlfriend, on November 2, 2007. Both agents wore concealed cameras. Summers informed Wade that she had not had time to pick up the gun Wade had selected at Otisville. Wade asked if he could get an SKS rifle instead because he had given his "connection" at Sears one of his own SKS rifles to appease him. Wade and Summers agreed that Wade would get the Mossberg 500 pump-action shotgun later, in exchange for a plasma TV. While looking at SKS rifles, Wade asked Summers if "she had gotten new firearms in . . . . [a]nd she said yes, we get new stuff in all the time, never know what we're going to get." Wade ultimately picked out a Russian SKS rifle. Summers told Wade that he did not have to fill out any paperwork because this firearm came from Highland, as opposed to Otisville. This transaction was Wade's last undercover contact with Highland.

On November 29, 2007, ATF Special Agent Harry Powers (Powers) went into Highland while wearing a concealed recording device. He asked Summers whether there were new firearms at the store. Summers told Powers that Highland did not have any new items and that new firearms would have to be purchased from Otisville. Powers decided to buy a Remington 12-gauge shotgun, model 1100. Summers asked Powers to fill out ATF Form 4473. While completing this form, Powers told Summers that he had some problems with the question asking whether the purchaser had been convicted of a misdemeanor crime of domestic violence. Summers asked Powers whether he had ever been convicted of such a crime, but before he responded she said that he should answer

9

the question in the negative. She also explained that she was not going to call anyone regarding the information on the form and that she was only using the form to identify her customers. This visit was Powers's sole undercover contact with Highland.

On February 12, 2008, ATF Special Agent Richard Chandler (Chandler) stopped by Highland. He wore a concealed recording device that malfunctioned during the visit. Chandler told Kish that he had previously visited Highland in November and asked if Kish had acquired any new firearms since that time. Kish informed Chandler that "about half of the inventory [was] new." He also said that he had recently sold a firearm that cost several thousand dollars and the purchaser of this gun had just come back to Highland looking for a gun that was even more expensive.

After Kish received a telephone call, another Highland employee assisted Chandler and confirmed that approximately half of the guns in the store were new. Chandler selected and paid approximately $400 for a Brazilian-made 12-gauge double-barrel shotgun. He did not have to show any identification or fill out any paperwork to purchase the firearm. After completing the transaction, Chandler asked Kish if he could purchase a handgun. Kish advised Chandler that he would need to know the exact make and model that Chandler was looking for, or Chandler would have to go to Otisville, which had a big inventory. Chandler also asked Kish whether he could see a firearm as expensive as the one Kish had previously described. Kish did not have any of these guns in stock, but stated "all it takes is a phone call."

On July 23, 2008, Chandler returned to Highland while wearing a concealed recording device, told Kish that he had been there before, and asked whether Highland had gotten any new firearms since that time. Kish stated that the firearms changed almost daily. Chandler first spoke

to Kish about a replica Thompson sub-machine gun that was on display. Kish stated that the price of this gun was $2,500 and that it was easier for him to "get rid of" the higher-end guns; he had acquired this gun the previous day and expected it to be gone within the next few days. Chandler asked Kish if he had other guns that were not on display and Kish informed him that, "for insurance purposes, he could only have . . . 200 firearms on display. . . . [b]ut that he had firearms in the building that were not on display that . . . he could sell."

Kish then called out to Summers and asked her to find a 12-gauge or a 20-gauge double-barrel shotgun. Summers walked out of sight and returned with a Boito 20-gauge double-barrel shotgun. Chandler purchased this firearm for $325. Neither Summers nor Kish requested that he provide his identification or fill out any paperwork. Before Chandler left Highland, Kish handed him a flyer that stated "complete repair facilities, thousands of guns in stock, full line of all makes and models. Pawn, buy, sell, trade. Top dollar paid for used guns." The flyer had directions and addresses for Highland and Otisville.

In light of Kish's statements that new guns were coming into Highland all the time, Special Agent Logwood felt that he had completed his investigation of Highland. On August 13, 2008, Logwood obtained a search warrant for Highland. Logwood also requested that a complaint be issued for the arrest of Kish and Summers on charges of dealing in firearms without a license. The same day, Logwood entered Highland in an undercover capacity to ensure that its appearance was the same as had been depicted in the undercover videos. He observed approximately 125-150 guns, most with price tags, on display at Highland.

11

A search warrant was executed on August 14, 2008, and Kish and Summers were arrested when they arrived at Highland. At the time of his arrest, Kish was found to be in possession of a .357 caliber revolver. He also had a copy of the FFL for Otisville in his pocket. Kish did not have a valid concealed-weapons permit at the time. Following their arrest, Kish and Summers were brought before a magistrate judge, who released them on bond the same day.

ATF agents ultimately seized 477 firearms from Highland, including the pistol found in Kish's possession; 157 guns were removed from the main showroom, thirty-six from other areas on the main floor, 240 from the basement gun vault,[5] and forty-three from the attic. The agents did not seize firearms with antique ignition systems such as black powder rifles or pistols or firearms manufactured before 1898. During their search of Highland, the agents did not find any completed 4473 forms or record books.

ATF agents attempted to trace all the guns seized from Highland. If a trace was successful, and if the firearm in question was purchased after Highland lost its license in February 2005, ATF agents attempted to contact the purchaser. Several individuals responded to these inquiries and described purchasing weapons from, and trading various weapons in exchange for cash at Highland.

On September 17, 2008, Kish and Summers were each indicted on one count of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). They pleaded not guilty and

---

[5]Kish testified that the vault contained his personal gun collection and that a sign on the vault door stated "private personal collection not for sale." Several friends of the couple also testified that such a sign was on the door of the vault prior to the search of Highland. Additionally, Kish testified that he found the sign crumpled up behind a display case in a room adjoining the vault several days after the search. None of the ATF agents remembered seeing any signs on the vault on the day of the search.

proceeded to trial. On April 17, 2009, the jury found both Kish and Summers guilty. The district court sentenced Kish to 48 months' imprisonment and Summers to 57 months' imprisonment.

## II. Analysis

### A.

Kish and Summers first argue that the district court erred in denying their motions for a judgment of acquittal. We review de novo the denial of a motion for acquittal, viewing the evidence in "a light most favorable to the prosecution, giving the prosecution the benefit of all reasonable inferences from the testimony." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir.), *cert. denied*, 552 U.S. 976 (2007) (citations omitted). "The relevant question in assessing a challenge to the sufficiency of the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citations omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We may not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (citing *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999)). "A defendant claiming insufficiency of the evidence bears a very heavy burden." *Graham*, 622 F.3d at 449 (citations omitted).

The relevant statute in this case, 18 U.S.C. § 922(a)(1)(A), prohibits anyone who is not "a licensed importer, licensed manufacturer, or licensed dealer" from "engag[ing] in the business of importing, manufacturing, or dealing in firearms." As applied to a dealer in firearms, "engaging in the business" means that the individual "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the

repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). Section 922(a)(1)(A) does not apply to a person who occasionally sells, exchanges, or purchases firearms to enhance a personal collection or as a hobby, "or who sells all or part of his personal collection of firearms." *Id.*

Kish and Summers argue that the evidence was insufficient for a rational trier of fact to find beyond a reasonable doubt that they were dealing in firearms without a license. They contend that their actions did not satisfy the requirements of § 922(a)(1)(A) because they were merely making occasional sales, exchanges, or purchases of firearms for the enhancement of their respective personal gun collections.

The evidence, considered in the light most favorable to the government, was sufficient for the jury to find beyond a reasonable doubt that Kish and Summers were engaged in the repetitive purchase and resale of firearms with the principal objective of livelihood and profit. ATF agents seized nearly 500 firearms from Highland. Some of these firearms were sold or traded to Highland after Highland's FFL was revoked, by individuals who testified as rebuttal witnesses on behalf of the government. The number of firearms seized combined with the fact that the guns sold or traded to Highland by the rebuttal witnesses were found on display with price tags suggests that Kish and Summers were actively buying and selling guns, rather than supplementing their own personal gun collections or selling these collections.

Additionally, both Kish and Summers told various ATF agents that Highland's inventory changed frequently and that they were constantly getting new firearms. Kish told Special Agent Chandler that he could only have 200 firearms on display for insurance purposes, but "that he had firearms in the building that were not on display that . . . he could sell."

14

Although Summers argued at trial that she kept a personal record of Highland's transactions, which showed that Highland sold very few firearms, the government presented testimony that Summers only wrote down the details of transactions shown on the video recordings made by undercover ATF agents or mentioned in the complaint.[6] The district court determined that Summers's testimony regarding her personal records of sales conducted at Highland constituted perjury.

Because the evidence was sufficient to support the jury's verdict, the district court did not err in denying Kish's and Summers's motions for a judgment of acquittal.

**B.**

Kish and Summers next argue that the district court erred because it gave the jury a modified instruction on the concept of proof beyond a reasonable doubt instead of instructing the jury in accordance with Sixth Circuit Pattern Instruction No. 1.03, ¶5. We review a district court's refusal to give a proposed jury instruction for an abuse of discretion. *United States v. Adams*, 583 F.3d 457, 468-69 (6th Cir. 2009). Such refusal is considered reversible error only if the proposed instruction is "(1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it substantially impairs defendant's defense." *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) (citations and internal quotations omitted). We will reverse a conviction based on a claim of error "only if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *Id.* (citations and internal quotations omitted).

---

[6] Summers was permitted to view these videos and review the complaint in this case prior to the start of trial.

Instead of the language "proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives," the district court instructed:

> What is reasonable doubt? The phrase almost defines itself. A reasonable doubt is a fair, honest doubt based upon reason and common sense growing out of the evidence or lack of evidence, or perhaps the nature of the evidence. Ultimately, a reasonable doubt would simply be a doubt that you find to be reasonable after you have carefully and thoughtfully examined and discussed the facts and circumstances present in this case.

There is no dispute that the proposed jury instruction was a correct statement of the law. Kish and Summers further argue that the requested instruction was not substantially covered by the given instruction because it contained a watered-down definition of the government's burden, and that the district court's failure to give the requested instruction impaired Kish's and Summers's theory of the case because a jury that was properly instructed on the meaning of proof beyond reasonable doubt could have concluded that the government did not meet its burden in this case.

We have held that the "hesitate to act" language does not need to be included in a reasonable doubt instruction, *see Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999), and that "comparing a reasonable doubt to a 'fair, honest doubt' . . . . does not suggest to the jury a lowering of the government's burden of proof." *Id.* Further, the remainder of the district court's reasonable doubt jury instruction adhered closely (if not verbatim) to the Sixth Circuit pattern instruction. Thus, the instruction as a whole was not confusing, misleading, or prejudicial.

The two cases on which Kish and Summers rely in arguing that failure to include the "hesitate to act" language in a reasonable doubt instruction is reversible error, *United States v.*

16

*Wosepka*, 757 F.2d 1006 (9th Cir. 1985), and *United States v. Birbal*, 62 F.3d 456 (2d Cir. 1995), are inapposite. In *Wosepka*, the Ninth Circuit, finding that the case involved "complexity" and "conflicting evidence," held that the "court's abbreviated instruction did not provide the guidance the jury needed in this complicated case." 757 F.2d at 1010. However, the Ninth Circuit subsequently overruled *Wosepka* with its decision in *United States v. Nolasco*, 926 F.2d 869 (9th Cir. 1991), thereby returning "the decision to define reasonable doubt to the sound discretion of the trial court." *Id.* at 872. The Second Circuit invalidated the instruction in *Birbal* not because the district court had omitted the "hesitate to act" language, but because it told the jury "[s]hould the prosecution fail to prove the guilt of a defendant beyond a reasonable doubt, you *may* acquit the defendant on the basis of the presumption of innocence." 62 F.3d at 460 (internal quotations omitted). The standard instruction tells "the jury that 'If the government fails to sustain its burden you *must* find the defendant not guilty.'" *Id.* (citations and internal quotations omitted). The Second Circuit stated that this particular instruction, "unlike much of the suggested language in the various pattern instructions, is not optional," *id.* (citations omitted), and concluded that "[b]y instructing the jury that it 'may,' rather than 'must,' acquit if the government failed to meet this burden, the court gave the jury the clearly unlawful option of convicting on a lower standard of proof," *id.*

Kish's and Summers's proposed jury instruction was substantially covered by the district court's actual instruction. The instruction given did not lessen the government's burden of proof and, when viewed as a whole, was not confusing, misleading, or prejudicial.

**C.**

17

Kish and Summers also argue that the district court improperly concluded that they should each receive a ten-level enhancement pursuant to U.S. Sentencing Guideline § 2K2.1(b)(1) because more than 200 firearms were involved in the offense. We review a district court's factual findings concerning a sentence enhancement under the Guidelines for clear error, *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010), and the application of these facts to the Guidelines de novo, *see id.*

Section 2K2.1(b)(1), in relevant part, provides for a four-level enhancement if the offense involves eight to twenty-four firearms, a six-level enhancement if the offense involves twenty-five to ninety-nine firearms, and a ten-level enhancement if the offense involves 200 or more firearms. Application Note 5 to Subsection (b)(1) states that "only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed" should be counted for purposes of this Guideline.

Very few cases have dealt with the meaning of § 2K2.1(b)(1) in the context of unlawful possession of firearms by individuals found to be dealing in firearms without a license. One decision has suggested that the number of firearms involved in the offense of dealing in firearms without a license includes those sold and those possessed with the intent to sell (or those available for sale). *See United States v. Bolton*, 66 F. App'x 638, 639-40 (7th Cir. 2003).[7] Other decisions have held

---

[7]The issue on appeal in *Bolton* did not concern § 2K2.1(b)(1), but the facts of *Bolton* are relevant to this case. Bolton had purchased eleven handguns and sold or traded seven of them without an FFL before getting arrested. He was convicted of dealing in firearms without a license. The parties agreed that the offense involved eleven firearms and that a four-level sentence enhancement under § 2K2.1(b)(1)(B) was appropriate, raising the inference that firearms actually sold *and* firearms possessed with the intent to be sold (or made available for sale) should be

that in determining how many firearms were involved in the offense, a district court may generally

consider offense conduct and relevant conduct. *See* U.S.S.G. § 1B1.3; *see also United States v. Birk*,

453 F.3d 893, 899-900 (7th Cir. 2006); *United States v. Santoro*, 159 F.3d 318, 321 (7th Cir. 1998)

("When a court determines the number of firearms involved in an offense under U.S.S.G. §

2K2.1(b)(1), it looks to the relevant conduct section of the guidelines (U.S.S.G. § 1B1.3(a)(2)) to

determine how many firearms come within the same course of conduct or perhaps a common scheme

or plan.").

At sentencing, Kish agreed that "the qualifying firearms that were for sale on the floor are

properly included in the offense," but argued that some weapons found on the main floor were not

firearms within the meaning of federal law, and therefore "there were somewhere between 25 and

99 firearms placed out on racks presumably for sale." He asked that the district court "increase the

offense level only six points rather than ten points." Summers agreed with Kish's position and also

argued that the firearms found at her flea market booth should not be counted.[8]

The district court heard testimony from Kish and from Special Agent Logwood regarding the

number of firearms found on the main floor and in other areas of Highland. It found that more than

200 firearms were involved in the offense even when the firearms found in the attic, basement, and

stairwells were not included in the total. The district court also noted that the preponderance of the

considered to be involved in the offense of dealing in firearms without a license.

[8]In addition to helping run Highland, Summers had a booth at the Dixieland Flea Market in Pontiac, Michigan. On August 15, 2008, a friend met with Kish and Summers at the flea market and took possession of approximately thirty to forty guns that Summers had for sale there. The friend sold the guns for $1,200 and turned this money over to Summers.

evidence suggested that the firearms found in the basement and attic "were indeed available for sale.

. . . They were, in large measure, common firearms that were 'collected' if at all for the purpose of

acquiring a stock in trade in order to sell, should a willing purchaser present himself and wish to buy

such an item."

Kish and Summers now argue, contrary to their positions at the sentencing hearing, that only

the firearms that were actually sold (a number less than twenty-four) should be deemed to have been

involved in the offense. They rely solely on our unpublished decision in *United States v. Brickner*,

No. 96-3783, 1997 WL 159331 (6th Cir. April 3, 1997). In *Brickner*, a federally-licensed gun dealer

"pleaded guilty to having violated 18 U.S.C. § 922(b)(3) by selling two firearms to a person who did

not reside in the state where the licensee's place of business was located." *Id.* at *1. "[T]he district

court added three levels to [the defendant's] base offense level in the belief that nine firearms were

involved [in the offense]." *Id.* We held, however, that "under the plain language of the guidelines,

six of these weapons should not have been counted." *Id.* We determined that while the defendant

did sell three firearms to non-residents through strawmen residents in Ohio, it was not unlawful for

the defendant to possess the six firearms at issue, as they were seized prior to their distribution. *Id.*

at *2.

*Brickner* is inapplicable to this case because the defendant in *Brickner* was a federally-

licensed firearms dealer and therefore it was not unlawful for him to possess firearms with the intent

to sell them. His only crime was selling firearms to out-of-state residents, and only the firearms

actually sold to non-residents would have been involved in that offense. By contrast, Kish and

Summers were not federally-licensed firearms dealers, and thus it was not only unlawful for them

to sell firearms with the principal objective of livelihood and profit, but also to make firearms available for sale with this objective.

Despite their argument on appeal, Kish and Summers acknowledged at sentencing that the firearms available for sale at Highland were properly included in the offense. They only questioned the *number* of firearms that were on sale. Even excluding the firearms found in the attic, basement, and stairwells, the district court found that the number of firearms involved in the offense exceeded 200. Testimony showed that many of the firearms found in the attic and basement had price tags, and that Kish and Summers were willing to sell them. The firearms placed for sale at Highland and at the flea market are fairly considered part of Kish's and Summers's course of conduct or scheme or plan to deal in firearms without a license. Therefore, the number of firearms involved in the offense was the number distributed *and* made available for sale by Kish and Summers. Because this number exceeded 200, the district court did not err in determining the amount of firearms involved in the offense.

### D.

Finally, Kish argues that he did not commit perjury and therefore the district court erred in imposing a two-level obstruction-of-justice enhancement pursuant to U.S. Sentencing Guideline § 3C1.1 "Review of a district judge's decision to impose an obstruction of justice enhancement pursuant to § 3C1.1 is a three-step process." *United States v. Chance*, 306 F.3d 356, 389 (6th Cir. 2002). First, we review "the district court's finding of facts underlying the enhancement for clear error." *Id.* (citing *United States v. Middleton*, 246 F.3d 825, 846 (6th Cir. 2001)). Next, we review de novo "the district court's conclusion that a given set of facts constitutes obstruction of justice."

*Id.* (citations omitted). Finally, "once the district court has determined that the defendant has obstructed justice, the application of the two level enhancement is mandatory and we review the enhancement de novo." *Id.* (citations omitted).

Section 3C1.1 provides that if a defendant willfully obstructs the administration of justice with respect to the investigation, prosecution, or sentencing of the offense of conviction, and the obstructive conduct relates to the defendant's offense of conviction and any relevant conduct or to a closely related offense, the offense level shall be increased by two levels. According to Application Note 4, the two-level enhancement applies to a defendant who commits, suborns, or attempts to suborn perjury, "including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." Application Note 2 cautions, however, that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

To impose an obstruction of justice enhancement based on perjury, the district court must "identify the particular portions of the defendant's testimony it considers to be perjurious," and "make specific findings as to each element of perjury or make a finding that 'encompasses all of the factual predicates for a finding of perjury.'" *Chance*, 306 F.3d at 390 (citations omitted). A district court's "finding of perjury [is] sufficient where it state[s] that "*the defendant was untruthful at trial with respect to material matters* in this case' and that the untruthful testimony on material matters

'*was designed to substantially affect the outcome of the case.*'" *Id.* (citations omitted) (emphasis in original).

At sentencing, the district court clearly identified the particular portions of Kish's testimony that it considered perjurious. The district court also made specific findings as to each element of perjury concerning such testimony. It determined that Kish's testimony about the family gun collection in the basement gun vault not being for sale was "material to the issue of willfulness, knowledge, and intent, and was false . . . by a preponderance of the evidence." The district court found to be false Kish's testimony that a replica Thompson sub-machine gun displayed at Highland did not work. The district court noted that there was evidence that this "firearm in fact had been sold as a presumably working model" and that it was "sold for multiple hundreds of dollars." The district court also determined that Kish committed perjury when he denied telling Kopcak "we'll just have to play musical licenses then" when Kopcak served Kish with the final notice of revocation of Highland's FFL. The district court concluded that Kish's "testimony in court on these specific instances . . . was knowingly and willfully and purposefully false. It meets the definition of perjury. It was material. [I]f accepted, it could have made a difference to the jury in terms of their assessment of wilfulness."

The court's finding of perjury is supported by the record. Kish's testimony about his family gun collection was perjurious. In light of the evidence presented at trial, Kish intended to sell and, indeed, made available for sale, firearms stored in the basement gun vault. The basement vault contained a large number of guns, many of which were very common and were not typical collector's items. Some of these firearms had price tags. Contrary to Kish's testimony, no ATF agent testified

to seeing a "private personal collection not for sale" sign on the basement vault. Kish also told Special Agent Chandler that although he could only have 200 guns on display for insurance purposes, he had firearms in the building (and not on display) that he could sell. Thus, Kish's testimony that the guns stored in the vault were part of his family gun collection and were not for sale was knowingly false. This testimony was material and was designed to substantially affect the outcome of the case because the testimony related directly to Kish's arguments that he was not dealing in firearms without a license, but instead was making occasional sales, exchanges, or purchases of firearms for the enhancement of a personal gun collection, and that only firearms from Summers's personal gun collection were sold.

Kish's testimony at trial that a replica Thompson sub-machine gun which he talked about with Special Agent Chandler was a "theater gun" that "couldn't fire a shell" was also knowingly false. Although at trial Kish admitted telling Chandler that this gun worked and was very valuable, Kish claimed that he had been "pulling [Chandler's] string" and using "salesmanship" tactics. Evidence presented at trial showed that Kish had sold at least one other *working* Thompson sub-machine gun to one of the rebuttal witnesses. This testimony was material and was designed to substantially affect the outcome of trial because it related directly to Kish's argument that he was not dealing in firearms without a license. In this case, if Kish's testimony was to be believed, he was selling non-working collector's items, and not firearms.

Kish's statement regarding "musical licenses" is more accurately characterized as an inaccurate statement resulting from confusion, mistake, or faulty memory. This comment was purportedly made in an off-hand manner several years prior to trial. Moreover, this comment's

importance is relatively minor in light of other, more substantive testimony presented at trial. Because at least two portions of Kish's testimony were perjurious, however, the district court did not err by imposing a two-level enhancement for obstruction of justice.

### III. Conclusion

Based on the foregoing, we **AFFIRM** Kish's conviction and sentence and Summers's conviction and sentence.