**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0408n.06

No. 11-1305

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | ***Apr 13, 2012*** |
| Plaintiff-Appellee, | ) | LEONARD GREEN, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR THE |
| JOSEPH GRAY, | ) | WESTERN DISTRICT OF MICHIGAN |
|  | ) |  |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |

BEFORE:  GUY and DONALD, Circuit Judges; O'MEARA, District Judge.[*]

DONALD, Circuit Judge.    On January 13, 2010, a grand jury indicted Defendant-Appellant Joseph Gray ("Gray") on one count of unlicensed firearms dealing, in violation of 18 U.S.C. § 922(a)(1)(A), (a)(1)(D) (Count I), and one count of sale or transfer of a firearm to a prohibited person, in violation of 18 U.S.C. § 922(d)(1), (a)(2) (Count II).  After a four-day trial, a jury found Gray guilty as to Count I but not guilty as to Count II.  The district court sentenced Gray to twenty-seven months imprisonment followed by two years of supervised release.  Gray timely filed a notice of appeal, arguing that the evidence did not support his conviction and that his sentence was unreasonable.  For the following reasons, we AFFIRM.[1]

_____

[*]The Honorable John C. O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]Gray has filed two pro se "motions" on the appellate docket. These documents appear to assert claims for fraud on the court and ineffective assistance of counsel. Those issues are not before

## I. Factual Background

Joseph Gray is an army veteran who has a long history with guns. A lifelong hunter, Gray began handling guns before adulthood. He uses guns to teach Michigan hunter safety courses, and over the years he has collected upwards of 150 guns.

Gray and his wife, Paula Gray, owned and operated 101 Outdoors, a flea market-like business in Lawton, Michigan, where a variety of items, including hunting equipment, guns, and ammo were sold by a number of different vendors.[2] Gray himself used 101 Outdoors to sell firearms. From February 27, 1992, until February 28, 1998, Gray possessed a federal firearms license ("FFL"), which is necessary to sell firearms for business purposes, but he allowed the FFL to lapse. At the time of his arrest, Gray did not have a current FFL.

In 2008, a deputy with the VanBuren County Sheriff's Department contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("the ATF") regarding firearms being sold at 101 Outdoors. On October 14, 2008, a citizen provided the ATF with a brochure advertising that 101 Outdoors sold boats, fishing gear, live bait, hunting apparel and equipment, guns and ammunition, and archery supplies.

---

this court on direct appeal and are more appropriate for a separate civil or habeas action. We do not consider that information at this time.

[2]During the course of the ATF investigation, 101 Outdoors moved to a new location in downtown Lawton.

On October 16, 2008, Brian Luettke, an undercover ATF agent, went to 101 Outdoors to purchase a firearm. Outside 101 Outdoors, Luettke saw a sign advertising that the store carried firearms and ammunition. (D.E. #103 at 111:11-22.) He noticed twelve guns on display, some of which had price tags on them. (*Id.* at 112:13-113:19.) After speaking with Gray about the price of some untagged guns, Luettke purchased a Remington 12-gauge shotgun for $400. (*Id.* at 115:2-12.) Gray wrote this purchase in a receipt book and directed Luettke to sign it. (*Id.* at 119:16-121:6.) When Luettke asked Gray about buying a handgun, Gray informed him that he should just let him know what kind he was looking for because Gray got them all the time. (*Id.* at 122:17-13.) Also, during a later telephone conversation, Gray told Luettke that when he moved into the new 101 Outdoors in downtown Lawton he hoped to have over two thousand guns for sale. (*Id.* at 124:4-11.)

On October 23, 2008, Jeffrey Kitchen, another undercover ATF agent, visited 101 Outdoors to purchase a handgun. When Kitchen arrived at 101 Outdoors he noticed an unsupervised tent near the road under which about fifteen to twenty long guns were displayed on tables. (*Id.* at 152:16-19.) He then went inside the store and noticed several more long guns and a few handguns. (*Id.* at 154:16-155:7.) When Kitchen said he wanted to purchase a handgun, he was directed to Gray. (*Id.* at 153:20-154:7.) Kitchen selected and purchased a Bersa .380 handgun for $250. (*Id.* at 158:2-5.) Gray mentioned to Kitchen that he had purchased it for $200 (Id. at 156:19-20), and the receipt book noted that Gray obtained the gun on September 17, 2008 (*Id.* at 248:4-249:10; App'x 1 at 16).[3]

---

[3]Ken Krauter testified that in September 2008 he traded the Bersa .380 with Gray for a Model 1300 12-gauge shotgun for deer hunting. (D.E. #104 at 452:5-455:1.) Krauter also testified that firearms were displayed at 101 Outdoors for sale, purchase, and trade and that Gray would sell guns

On November 6, 2008, James Walsh, a third undercover ATF agent, visited 101 Outdoors. Upon entering the store he noticed a gun rack with several rifles and shotguns, some of which had price tags on them. (*Id.* at 167:15-168:3.) Walsh noticed Gray discussing a firearm and its price with customers in the store. (*Id.* at 168:4-20.) When Gray was finished with the customers, Walsh asked him the price of a camouflage, pump-action shotgun. (*Id.* at 169:16-170:6.) Walsh purchased this gun for $225. (*Id.* at 171:2-5.) As Walsh was leaving the store, Gray told him that he would be having an auction on November 8, 2008, at which he would be selling rifles, shotguns, and some handguns. (*Id.* at 172:5-16.)

On July 23, 2009, the ATF investigation used a convicted felon as a confidential informant ("the CI") to purchase firearms from the new 101 Outdoors location while wearing a recording device. (*Id.* at 188:19-25; 188:25-189:3; 191:5-21.) The CI was led by a store clerk to the gun section in the rear of the store. (*Id.* at 195:11-24.) The CI decided to purchase two guns and negotiated the price with Gray. (*Id.* at 196:5-15.) The CI paid $100 and $125 for the guns. (*Id.* at 199:1-13.) When talking with the store clerk, the CI mentioned that he did not think that he could buy a rifle. (*Id.* at 200:8-17.) Gray was approximately fifteen to twenty feet behind the CI when he made this statement. (*Id.* at 201:11-13.) This conversation was the basis for Count II.

The Government also presented testimony from persons who had sold guns to and/or purchased guns from 101 Outdoors. Matthew McLemore testified that in July of 2008 he went to

---

on consignment for others. (*Id.* at 455:12-456:23.)

101 Outdoors because he had two guns that he wanted to get rid of and wanted to see what he could get for them. (D.E. #104 at 418:8-11.) McLemore sold a Remington Model 870 Express 12-gauge shotgun to Gray for $150 and consigned with Gray a Remington Model 597 .22-caliber rifle for which he ultimately received $210. (*Id.* at 419:3-6; 421:1-422:1.) When McLemore returned to 101 Outdoors a few months later, Gray told him that he had sold the shotgun, although he did not say for how much. (*Id.* at 423:15-424:8.) Other witnesses testified that they purchased the shotgun for $225 in August 2008 (*id.* at 429:9; 430:1-5) and the .22 for $210 in September 2008 (*id.* at 437:13; 438:11-17; App'x at 21). The receipts from Gray's book indicated that the serial numbers of these guns matched those that McLemore sold to Gray. (*Compare* App'x at 10, rec. 807226 *with* App'x at 12, rec. 807233; *and* App'x at 10, rec. 807227 *with* App'x at 21, rec. 807269.)

David Staggs testified that in October 2008 he went to 101 Outdoors to sell some guns after seeing a sign advertising that the store bought, sold, and traded guns and ammo. (*Id.* at 472:19-473:7.) Staggs told Gray he had some guns for sale and asked whether Gray was interested in them. (*Id.* at 476:23-25.) He sold three guns to Gray—a Taurus .357 for $200 (*id.* at 478:1-11), a Remington 1100 for $200 (*id.* at 478:14-17; 479:2-4), and a Remington Western Field .30-06 for $200 (*id.* at 478:18-20; 479:2-4). The .30-06 was placed on hold for thirty days in case Staggs wanted to purchase it back, which he did not do. (*Id.* at 479:7-17.) On October 3, 2008, the same day Staggs sold the three guns to Gray, Thomas Scholz purchased the Taurus .357 from Gray for $300. (*Id.* at 444:20-445:2.)

On July 31, 2009, ATF agents executed a search warrant on the downtown location of 101 Outdoors. (*Id.* at 224.) Inside they discovered and seized twenty-three firearms, including several with price tags on them, in a section of the store that had gun racks and a sign advertising guns and ammo. (*Id.* at 228:14-22; 235:6-14; 236:16-17; 247:2-5.) The ATF agents also seized the receipt book and found thirty-two recorded transactions related to guns, but they did not find records of the sales to Walsh or the CI. (*Id.* at 247:7-248:3.) Karen Rivard, an ATF Task Force Officer, testified that she asked Gray about the receipt book, to which he responded that it "was his way of bookkeeping for business." (*Id.* at 246:23-247:1.)

When Rivard was talking with Gray, she asked him why he had not obtained a FFL before selling guns. (*Id.* at 254:2-5.) He explained that he had previously had one (*id.* at 254:21-255:1) but that before getting another one he wanted to have $1-2 million in liability insurance and money to start up the business (*id.* at 254:7-11).

At the conclusion of the Government's case-in-chief, Gray moved for judgment of acquittal pursuant to Rule 29. (Id. at 525:20-22.) The district court denied this motion as well as a renewed motion for acquittal brought after the close of all the proof. The jury returned a verdict of guilty as to Count I and not guilty as to Count II.

The district court held Gray's sentencing hearing on February 28, 2011. In a presentencing memorandum, Gray objected to his scoring under the Guidelines and requested a sentence that did not include incarceration. Relevant to this appeal, the district court overruled Gray's objection that

he should not receive an obstruction of justice enhancement for a threatening comment he made to a witness after the execution of the search warrant. The district court ultimately sentenced Gray to twenty-seven months imprisonment, which was at the bottom of his Guidelines range, to be followed by a two-year term of supervised release. Gray timely filed a notice of appeal as to his conviction and sentence on Count I.

## II. Analysis

### A. Sufficiency of the Evidence

Gray first argues that the district court erred in denying his motion for judgment of acquittal. We review *de novo* the denial of a motion for acquittal and view the evidence in "a light most favorable to the prosecution, giving the prosecution the benefit of all reasonable inferences from the testimony." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007), *cert. denied*, 552 U.S. 976 (2007). The relevant question in assessing a sufficiency-of-the-evidence challenge is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* We do not weigh the evidence, consider witness credibility, or substitute our judgment for that of the jury. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (citing *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999)). The sufficiency-of-the-evidence burden borne by the defendant is a heavy one. *Id.* at 449.

The relevant statute in this case, 18 U.S.C. § 922(a)(1)(A), prohibits anyone who is not "a licensed importer, licensed manufacturer, or licensed dealer" from "engag[ing] in the business of

importing, manufacturing, or dealing in firearms." As applied to a dealer in firearms, "engaging in the business" means that the individual "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). Section 922(a)(1)(A) does not apply to a person who occasionally sells, exchanges, or purchases firearms to enhance a personal collection or as a hobby, "or who sells all or part of his personal collection of firearms." *Id.* "The term 'with the principal objective of livelihood and profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents." 18 U.S.C. § 921 (a)(22). However, "a defendant need not deal in firearms as his primary business for conviction." *United States v. Manthey*, 92 F. App'x 291, 297 (6th Cir. 2004).

Gray does not contest that he purchased and sold firearms. Instead, he argues that his actions were part of selling and adding to his personal collection of firearms and that he did not have the principal objectives of profit and livelihood. The Government, however, submitted sufficient evidence for the jury to conclude that Gray was buying and selling guns for livelihood and profit rather than simply changing the composition of his personal collection.

We have previously held that evidence was sufficient to support a conviction under § 922(a)(1)(A) where it showed (1) that the defendant frequented flea markets and gun shows where he displayed and sold guns; (2) that the defendant offered to sell guns to confidential informants on multiple occasions and actually sold them three different guns on two different occasions; (3) and

that the defendant bought and sold guns for profit. *See United States v. Orum*, 106 F. App'x 972, 974 (6th Cir. 2004). Gray's circumstances are similar to those in *Orum*. He used 101 Outdoors to display and sell guns. Signs and flyers for 101 Outdoors advertised that the store dealt in firearms and ammunition. 101 Outdoors displayed guns—some of which had price tags—in a set-aside area and on at least one occasion on unsupervised folding tables near the road.

The evidence presented also established that Gray sold firearms to ATF agents, a confidential informant, and other individuals. He told one agent that he could get any handgun the agent wanted. Gray purchased and traded guns from people that brought them to 101 Outdoors, and he resold some of his new purchases or trades shortly after he acquired them, usually at a profit. Gray kept records of some of his transactions, and he moved his firearm selling operation with 101 Outdoors into its new location in downtown Lawton.

Although Gray argues that the Government only proved that two guns were sold shortly after Gray purchased them, the statute does not establish a minimum threshold for the number of guns sold. That Gray sold only two or three with a short turnaround was enough evidence for the jury to conclude that he had a profit motive in his gun sales. While cases Gray cites did involve significantly more gun sales than this case, *see United States v. Kish* , 424 F. App'x 398 (6th Cir. 2011) (finding sufficient evidence for conviction where nearly 500 guns were seized some of which had been sold or traded to the defendants and were seized with price tags on them); *United States v. Dettra*, 238 F. App'x 424 (6th Cir. 2000) (finding sufficient evidence for conviction where ninety-

five guns were seized, of which eighty-two were marked with price tags), they do not foreclose the possibility of conviction on a smaller number of guns.

Gray also claims that there was no proof that he committed the offense willfully. To be convicted under § 922(a)(1)(A), the defendant "must also have known that his conduct was unlawful." *Manthey*, 92 F. App'x at 296-97 (6th Cir. 2004) (citing *Bryan v. United States*, 524 U.S. 184, 196 (1998)). Gray notes that the open and obvious manner in which he operated out of 101 Outdoors suggests that he was not a willful violator. He also claims that ATF never warned him that his activities may be illegal.

The Government presented evidence from which the jury could conclude that Gray knew his conduct was unlawful. There was testimony that Gray had previously held a FFL. Thus, he was aware that a FFL is required to sell guns for profit and livelihood; it follows that he was likely aware that to do so without a FFL was unlawful. *See Orum*, 106 F. App'x at 974. Gray was also considering obtaining another FFL, and a blank form was discovered on his kitchen table. Further, Rivard testified that Gray told her that he knew about the FFL requirement. This was sufficient evidence for the jury to find that Gray's actions were a willful violation of the statute. That Gray operated his business openly was a fact for the jury to consider in determining whether Gray knew his conduct was unlawful; it is not dispositive of the issue. Also, there is no requirement that a defendant be warned that his conduct is unlawful.

Finding sufficient evidence for the jury to find Gray guilty as to Count I, we affirm Gray's conviction for selling firearms without a license.

## B.  Reasonableness of the Sentence

As to his sentence, Gray first argues that the district court should not have applied a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1.  "We review a district court's factual findings concerning a sentence enhancement under the Guidelines for clear error, *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010), and the application of these facts to the Guidelines de novo, *see id.*" *Kish*, 424 F. App'x at 408.  Section 3C1.1 applies when the obstructive conduct relates to "(i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense."  This adjustment applies to conduct such as "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly."  USSG § 3C1.1, n.4.  The district court applied the enhancement because after officers executed the search warrant, Gray told witness Jesse Hall that if he did not do what Gray wanted  it would be the worst mistake of his life.  Hall testified that he found the comment threatening.

First, Gray claims that Hall's testimony about the threat was not credible because he testified in connection with Count II, the charge of selling a gun to a felon, of which the jury acquitted Gray.  Thus, Gray argues that Hall's testimony could not support the application of the enhancement to Gray.  However, the district court concluded that Hall was credible and that Gray's comment was a threat justifying the enhancement.  (D.E. #107 at 20:9-19; 21:12-18.)  The district court also

explained that Gray's acquittal as to Count II does not lessen Hall's credibility because the jury could have concluded that Gray did not know that the confidential informant was a convicted felon. (*Id.* at 21:5-11.)

Second, Gray argues that Hall's testimony was not related to Count I. Because Hall's testimony concerned the selling of firearms to a felon, which was the subject of Count II, Gray contends, the enhancement could not apply because the threat was not related to the conviction on Count I. The district court rejected this argument, pointing out that Hall's testimony also pertained to an instance where guns were sold by Gray from 101 Outdoors, which would be relevant to Count I. (*Id.* at 22:9-16.) Accordingly, the district court concluded that Gray's threat did relate to Count 1, thus making the enhancement applicable.

The record contained sufficient evidence for the district court to conclude by a preponderance of the evidence that Hall was credible, that Gray's comment was a threat, and that Hall's testimony related to Count 1. The district court did not commit clear error in making the factual determinations on which it based the enhancement. Therefore, Gray was subject to the two-level enhancement for obstruction of justice, pursuant to USSG § 3C1.1, and the district court did not err in applying it.

Gray's second argument concerning his sentence is that it is substantively unreasonable because the district court only considered his mitigation arguments under the Guidelines and not under the 18 U.S.C. § 3553(a) factors. We review the reasonableness of a sentence for abuse of discretion. *United States v. Skipper*, 552 F.3d 489, 493 (6th Cir. 2009). "A sentence is substantively

unreasonable if the sentencing court arbitrarily selected the sentence, based the sentence on impermissible factors, failed to consider pertinent § 3553(a) factors, or gave an unreasonable amount of weight to any pertinent factor." *United States v. Cunningham*, — F.3d —, 2012 WL 593110, at *8 (6th Cir. 2012) (citing *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006)). Sentences within the Guideline range are given a rebuttable presumption of substantive reasonableness. *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). We give due deference to a district court's conclusion that the imposed sentence was warranted under the § 3553(a) factors; that we would have imposed a different sentence is not a justifiable reason to reverse the district court. *Id.*

The district court calculated Gray's Guideline range as 27 to 33 months and sentenced him to a bottom-of-the-Guideline range sentence of 27 months. Because that sentence was within the Guideline range, it is presumed reasonable. Gray's argument that the district court did not consider his mitigation arguments in the § 3553(a) context does not overcome this presumption.

Gray's sentence was not substantively unreasonable. The district court addressed each of the mitigating factors Gray raised. It determined that Gray's alleged health issues, both mental and physical, did not warrant a sentence below the Guideline range. (Doc. #107 at 43:8-44:3.) It concluded the same with respect to Gray's military service (*Id.* at 44:4-10), his civic activities (*Id.* at 44:11-17), the financial hardship a prison sentence would impose on his family (*Id.* at 44:18-45:19), and his lack of criminal history (*Id.* at 46:5-8). Instead, the district court reasoned that the § 3553(a) factors, particularly general deterrence, warranted a sentence within the Guideline range. (*Id.* at 47:9-48:5; 49:4-8.) The district court did take the mitigating factors of Gray's military service

and health into consideration when determining that a sentence at the low end of the Guidelines range was warranted. (*Id.* at 49:9-19.)

The district court repeatedly stated that Gray's mitigating factors did not warrant a "departure," suggesting a downward variance pursuant to the Guidelines rather than a variance based on its own sentencing discretion. However, later statements from Gray's counsel and the district court make clear that the court's rejection of Gray's mitigating factors applied to its consideration of the § 3553(a) factors as well.

> THE COURT: [Gray's counsel], any legal objections to the sentence imposed?
>
> [GRAY'S COUNSEL]: Other than the ones already placed on the record, your Honor, and just for clarification, many of the arguments that I raised in my brief, including the financial damage to his family, his mental and physical health, and his military service, were meant to be primarily in defining him as a person of special characteristics as a variance more so than as a departure, but I understand that the Court analyzed it both as a departure and as a variance, and I just want the record to be clear that I was requesting it specifically as a 3553 factor.
>
> THE COURT: All right. Well, Thank you. And I hope my comments – I certainly meant to – Are you satisfied that I've addressed it on both grounds?
>
> [GRAY'S COUNSEL]: Yes, your Honor.
>
> THE COURT: All right. Thank you. Are you satisfied that I've addressed all of your arguments on the record?
>
> [GRAY'S COUNSEL]: Yes, your Honor.

(*Id.* at 51:19-52:15.) Because the district court adequately considered Gray's mitigating factors under § 3553(a), based its sentence on the § 3553(a) factors, and did not choose the sentence

arbitrarily, we conclude that it did not impose a substantively unreasonable sentence. Gray's

sentence is therefore affirmed.

### III. Conclusion

Finding sufficient evidence for the jury to find Gray guilty as to Count I and finding that the

district court did not abuse its discretion in sentencing Gray, we AFFIRM.