RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                    *Plaintiff-Appellee*,

    *v.*

JOSEPH SCOTT GRAY,

                 *Defendant-Appellant*.

No. 22-1828

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00099-1—Robert J. Jonker, District Judge.

Argued: October 30, 2024

Decided and Filed: November 14, 2024

Before: SUTTON, Chief Judge; READLER and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Cade McGavinn Brown, KERRICK BACHERT, PSC, Bowling Green, Kentucky, for Appellant. Kathryn M. Dalzell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Cade McGavinn Brown, KERRICK BACHERT, PSC, Bowling Green, Kentucky, for Appellant. Davin M. Reust, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge. Joseph Scott Gray honored his country as a soldier but not as a civilian. For more than a decade, he served in the military, earning a range of medals for his service in the Gulf War. But after leaving the service, he lied about his health to the Department

of Veterans Affairs to obtain benefits to which he was not entitled. A jury convicted Gray of several fraud-related offenses. And the district court sentenced him to five years in prison and imposed $264,631 in restitution.

We affirm the conviction and term of imprisonment but not the restitution order. Because the indictment alleged that Gray's criminal scheme began in 2015 and because the restitution order covered benefits a decade earlier, we vacate the restitution order.

I.

In 1987, Joseph Gray followed in his father's and brother's footsteps and enlisted in the U.S. Army as a paratrooper. To say his service was decorated understates matters. Gray received a slew of awards for valor, including the Army Achievement Medal and Army Commendation Medal, as well as two Bronze Service Stars for his tour of duty in the Gulf War.

But this service came at a cost. When Gray left the Army in 2003, he brought with him several injuries sustained over the course of his tenure. He had injured his knees and his back in a skydiving accident. He had been electrocuted, twice. And he suffered from post-traumatic stress disorder and other health conditions as a result of his service in Operation Desert Storm.

The Department of Veterans Affairs pays veterans based in part on the severity of their disabilities. In 2004, the Department assessed Gray and deemed him 90% disabled. That entitled him initially to about $1,700 per month.

Gray sought more and lied in doing so. His first gambit was to seek "individual unemployability" benefits—roughly an additional $1,000 monthly payment reserved, as the name implies, for veterans unable to work because of their disabilities. Between 2004 and 2005, he told Veterans Affairs that he faced "unbearable" pain every day, that he "use[d] a cane around the house" and "a motorized cart" otherwise, and that "[h]e no longer drives." R.126-4 at 5–6. His wife Paula supported his application, telling Veterans Affairs that Gray "stays home most of the time, lying in bed," unable to "get out and work." R.126-11 at 4. None of this was true. But because Veterans Affairs did not know otherwise, it increased his benefits.

Gray's second gambit met with similar success. In 2015, he applied for "aid and attendance" benefits—an additional $400-or-so monthly payment for veterans who need help with basic daily activities such as getting dressed or eating a meal. After Veterans Affairs denied his application, Gray filed an internal appeal, in which he peddled lies similar to those he had told a decade earlier: that he had "los[t]" the "use of [his] legs," was "unable to stand," had "los[t]" the "use of [his] left hand," and "need[ed] bathing help." R.166 at 12; R.155 at 89–90. Paula concurred, telling Veterans Affairs that her "days and nights are a constant vigil to care for [her] spouse," as she must "feed[], bath[e], [and] cloth[e]" him. R.166 at 15–16. Gray's appeal succeeded, and Veterans Affairs awarded him more benefits.

Gray's third gambit sought to obtain money for his wife's services. In 2017, he applied for his wife to receive caregiver benefits—a stipend and health insurance reserved for family members who provide day-to-day care to housebound veterans. These benefits require a more thorough assessment than the benefits Gray had sought in the past. In the first step, a phone conversation, Gray repeated the lies he had previously told—that he needed Paula's assistance to dress, to bathe, even to cut his food and brush his teeth. When asked to come to a nearby Veterans Affairs office for an in-person assessment, he agreed.

That was a bridge too far. The Veterans Affairs' Office of Inspector General, as it happens, had received a tip about Gray's efforts to manipulate the system. Its investigators coordinated with local Veterans Affairs employees to videotape the examination, while they conducted additional surveillance of Gray outside. The videos showed the following. When the Grays arrived, Paula assisted her husband out of their car and into a wheelchair, which she pushed into the office. He told Veterans Affairs examiners that he was almost "totally dependent" on his wife, that he could not feed or dress himself, that he could not use his left hand, and that he had not walked unaided in a decade. Gov't Ex. 10.1–10.13. Paula agreed. Once they left the office, the investigators trailed them. A few miles down the road, the Grays pulled into a restaurant. Gray exited the vehicle without assistance, walked into the restaurant without assistance, ate freely without assistance, and used his left hand without apparent difficulty. Gray's claimed symptoms had vanished in a matter of minutes over a few miles.

A grand jury indicted Gray and his wife for his second and third gambits, but not his first. It charged him with conspiring to defraud the United States, making false statements to a federal agency, submitting a fraudulent claim to a federal agency, and stealing government funds. The indictment alleged that the conspiracy began "in or about January 2015," R.1 at 1, namely a month before Gray applied for aid and attendance benefits. Gray and his wife pleaded not guilty.

The trial did not go well for Gray. The jury heard from Gray's neighbors, and from those who knew him around town, each of whom testified that he lived a normal life, with no apparent physical limitations. The jury saw surveillance footage from local businesses in which he walked freely and lifted heavy objects. And the jury saw the videotapes of Gray's in-person examination, and of Gray immediately afterward. Testifying in his own defense, Gray attributed his misstatements to his medication, which caused him to "say things not really knowing what [he was] saying or not really understanding the questions." R.156 at 70. He told the jury that he has "short-term memory problems," and his long-term memory "kind of ended about '07." R.156 at 82. The jury found Gray and his wife guilty on all counts.

The district court sentenced Gray to 60 months, a term above the Guidelines range of 41 to 51 months, and ordered him to pay $264,631.51 in restitution, a figure calculated based on benefits he received from 2004 onward.

## II.

We first consider Gray's single challenge to his conviction. At issue is whether the court properly excluded one of Gray's proposed expert witnesses, Dr. Ennis Berker, under Evidence Rule 702. Abuse-of-discretion review applies. *United States v. Gardner*, 32 F.4th 504, 519 (6th Cir. 2022).

An expert's opinions may be admitted at trial only if he is qualified to give them and they are relevant to the case at hand. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 592–95 (1993). To be qualified, the expert must have specialized knowledge or skill about the subjects on which he seeks to opine. Fed. R. Evid. 702. To be relevant, the expert's opinions must advance "a material aspect" of the proponent's case. *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (quotation omitted).

The district court did not abuse its discretion in excluding Dr. Berker. The court sensibly reasoned that a neuropsychologist had little expertise to offer about Gray's physical injuries, the first proposed topic of Dr. Berker's testimony. While the second topic, Gray's mental health, fell within Dr. Berker's ken, the subject had little to do with the issues at trial. The only theory of relevance Gray offered before the court was that "[m]ental health can . . . affect physical functioning and capability," which meant that Dr. Berker could "speak to the relationships between" Gray's "mental health" and the "physical limitations" he claimed to have. R.71 at 6. That was thin gruel, and the court did not abuse its discretion in rejecting the proposition that Dr. Berker's testimony about Gray's mental health might shed light on his physical health.

Gray resists this conclusion but only by moving the goal posts. On appeal, Gray argues that Dr. Berker's testimony could have clarified whether he "acted with the requisite mens rea," insofar as his memory loss and cognitive impairment may have "impeded his ability to respond accurately to questions." Appellant's Br. 22–23. But the testimony offered before the district court related only to the effect of Gray's "[m]ental health" on his "physical functioning and capability"—that is, the "extent of his physical limitations." R.71 at 6. Yes, Gray stated that Dr. Berker would discuss his "potential for malingering," R.56 at 3, but that referred to whether he had lied to Dr. Berker about his "cognitive abilities [and] emotional status," not whether he was lying in general, R.68 at 5–6. At no point did Gray suggest that Dr. Berker would say anything about any topic related to mens rea. Had Gray intended to offer Dr. Berker's "expert evidence" on his "mental condition" for that purpose, it bears adding, Criminal Rule 12.2(b) would have required him to file a notice to that effect. He filed no such notice, presumably because he did not intend to offer Dr. Berker's evidence for that purpose in the first place. The district court cannot be faulted for failing to admit evidence that Gray did not place before it. Fed. R. Evid. 103(a)(2) (to preserve objection to exclusion of evidence, proponent must "inform[] the court of its substance"). Gray's failure to offer this evidence below forecloses his challenge on appeal.

Because Gray did not present this evidence to the district court, he obtains no handholds from the cases he cites on appeal. They both involved defendants who squarely raised mens rea as a line of testimony for their proposed experts. *See United States v. Odeh*, 815 F.3d 968, 975–

76 (6th Cir. 2016); *United States v. Lilley*, No. 15-6415, 2017 WL 7048806, at \*4–5 (6th Cir. July 26, 2017).  Not so here.  The district court reasonably excluded Dr. Berker's testimony.

III.

Gray challenges his sentence as procedurally and substantively unreasonable.

A.

*Procedural reasonableness.*  Gray claims that the district court miscalculated his criminal history score under the Sentencing Guidelines.  Because Gray did not raise this point below, he must show a plain error that affects his substantial rights and implicates the fundamental fairness of the sentencing hearing.  *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

As with any adjudicative fact bearing on a sentence, proof of a defendant's criminal history must be shown by a preponderance of the evidence.  *See United States v. Hockenberry*, 730 F.3d 645, 666 (6th Cir. 2013).  When the presentence report includes such facts, and a defendant fails to object to them, the district court may rely on those facts.  Fed. R. Crim. P. 32(i)(3)(A).  A defendant's failure to object thus operates as an admission of his criminal history and of the relationship between his prior offenses and the offense of conviction. *Hockenberry*, 730 F.3d at 666.  When a court relies on those undisputed facts, it does not plainly err.  *Id.* at 667.

Two such facts affected Gray's criminal history score under the then-existing Guidelines. The presentence report assigned him three points for a prior conviction for the unlicensed sale of firearms.  It then assigned him two more points because he committed part of the instant offense (conspiracy) while on supervised release.  Gray did not object to these calculations or the facts underlying them.  When the district court asked whether he had any objections after pronouncing the sentence, he objected only to the court's upward variance.  *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004).  Gray thus admitted that he (1) had a prior conviction and (2) was on supervised release when he committed at least some of the conduct charged in the instant offense.  It follows that the district court did not plainly err in relying on those facts.  Gray's sentence is procedurally sound.

B.

*Substantive reasonableness.* Gray claims that the district court erred in sentencing him to 60 months—9 months above the top of the Guidelines range of 41 to 51 months. A sentence must be "sufficient, but not greater than necessary," to accomplish the goals of proportional punishment, deterrence, public safety, and rehabilitation. 18 U.S.C. § 3553(a). We review a sentence's length—whether it is "too long" or "too short" under the circumstances—for abuse of discretion. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

The court did not abuse its discretion in imposing this upward variance. Consider the details of Gray's offense. Not only did he steal from the government, but he did so over several years, with truly "blatant fraud" captured on videotape. R.159 at 28. He even enlisted his wife in the effort, who would have had a "a version of hell to pay" if she had refused to go along. R.159 at 29. What of deterrence? This was not Gray's first offense, and not even the first offense in which the district court found he had obstructed justice. As the court found, he lied on the stand in this trial, and he previously—when under investigation for selling firearms without a license—threatened witnesses and falsified documents. *See United States v. Gray*, 470 F. App'x 468, 474 (6th Cir. 2012). And he showed "zero insight into his own wrongdoing," blaming others—the court, Veterans Affairs, "the jury, the witnesses, whoever it may be"—instead of taking responsibility for his actions. R.159 at 30. All told, the court could reasonably impose this five-year sentence.

Gray complains that the district court failed to account for the mitigating factors. He argues that the court all but ignored his military service, related medical issues, and troubled childhood. But the court expressly considered the fact that Gray "serve[d] the country honorably as a veteran" and "sustained disabilities" as a result. R.159 at 30–31. True, the district court did not comment on Gray's troubled childhood, but neither did Gray or his counsel bring it up at the sentencing hearing. "[T]he district court's consideration of sentencing arguments is dynamic. The strategic decisions of the parties, including which arguments to emphasize, reasonably influence the district court's response." *United States v. Carter*, 89 F.4th 565, 570 (6th Cir. 2023). The court explained that it had read the defense submission, which discussed Gray's

childhood, and felt that "the whole file," considered together, warranted a five-year sentence. R.159 at 26–27.  We see no sound basis for second-guessing that judgment.

IV.

Gray challenges the temporal scope of the district court's restitution order.  The court, recall, required Gray to pay $264,631.51 in restitution, a figure calculated based on benefit payments from 2004 onward, even though the indictment charged Gray only with conspiring to defraud the government from 2015 to 2019.  We review afresh legal questions about the permissible scope of restitution.  *See United States v. Evers*, 669 F.3d 645, 654 (6th Cir. 2012).

Because the Mandatory Victims Restitution Act of 1996 governs the restitution order, we start there.  After a conviction for a federal crime "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," the Act says that a district court must "order . . . that the defendant make restitution to the victim of the offense."  18 U.S.C. § 3663A(a)(1), (c)(1)(B).  In a case like this one, where the defendant is convicted of an offense "that involves as an element a . . . conspiracy," the term "victim" includes "any person directly harmed by the defendant's criminal conduct in the course of the . . . conspiracy."  *Id.* § 3663A(a)(2).

The key phrase for today's purposes is "the course of the conspiracy."  We use two approaches to defining the course of a conspiracy:  one for defendants who plead guilty, and another for defendants found guilty by a jury.  If a defendant pleads guilty, we "look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the [conspiracy's] scope."  *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009), *abrogated on other grounds by Lagos v. United States*, 584 U.S. 577 (2018).  If a defendant proceeds to trial, as Gray did, "the scope of the scheme is defined by the indictment."  *United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011).

The indictment charged a conspiracy that lasted for about four and a half years.  "Beginning in or about January 2015," a month before Gray applied for aid and attendance benefits, "and continuing to in or about August 2019," when Veterans Affairs revoked his benefits, Gray and his wife "conspired and agreed to lie to" Veterans Affairs "in order to obtain disability and related benefits to which they were not entitled."  R.1 at 1.  No count of the

indictment referenced, expressly or obliquely, any conduct before 2015. By the indictment's terms, the conspiracy began in 2015 and concluded in 2019. Accepting a linear theory of time, a conspiracy that began in 2015 does not cause losses in 2004. That suffices to resolve this case. The restitution order should not have covered losses before January 2015.

Every circuit to consider the question has looked at it the same way. If an indictment alleges that a conspiracy began on a certain date, they all say, a defendant may not be held responsible for losses that occurred before that date. The Third Circuit: "[T]he offense of conviction is temporally defined by the period specified in the indictment or information." *United States v. Akande*, 200 F.3d 136, 141 (3d Cir. 1999). The Fifth Circuit: "[R]estitution cannot be awarded for 'losses' attributable to conduct outside the temporal scope of the scheme charged . . . ." *United States v. De Leon*, 728 F.3d 500, 507 (5th Cir. 2013). The Eighth Circuit: "[W]e look to the [temporal] scope of the indictment to determine whether an award is within the outer limits of a permissible restitution order." *United States v. Ramirez*, 196 F.3d 895, 900 (8th Cir. 1999) (quotation omitted). The Tenth Circuit: "[R]estitution orders under the [Act] are limited to losses caused by the offense of conviction. This necessarily includes the temporal limits of the offense as outlined in the indictment." *United States v. Alisuretove*, 788 F.3d 1247, 1258 (10th Cir. 2015) (quotation omitted). One of our colleagues reached the same conclusion in a case that did not directly present the issue. *See United States v. Ellis*, 938 F.3d 757, 765–66 (6th Cir. 2019) (Stranch, J., concurring).

The government urges us to form a minority of one. It invokes a provision of the Act that requires restitution to be ordered "in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A). Because Veterans Affairs' losses extend to 2004, the government argues, Gray should be held responsible for those losses to compensate the agency in full. It is not that easy. Sure, the Act requires a court to order restitution commensurate with "each victim's losses." But the government's invocation of this language begs the question: *Which* losses? The Act tells us where to look. In all cases, it limits the defendant's liability to "the loss sustained by a victim *as a result of the offense*." *Id.* § 3664(e) (emphasis added); *see also United States v. Church*, 731 F.3d 530, 538 (6th Cir. 2013). A defendant whose victims are eligible for restitution because of losses suffered "in the course of the . . . conspiracy," 18 U.S.C. § 3663A(a)(2), must repay losses

attributable to the conspiracy but need pay no more. While district courts must make victims whole, they may not make victims more than whole with respect to the charged conspiracy.

The government counters that the "full amount" provision was designed to expand the scope of restitution beyond the scope of the indictment, but the statute's history confirms its more limited role. Before the Act's passage in 1996, a district court was *permitted* to order restitution, but it was not *required* to do so. *See Hughey v. United States*, 495 U.S. 411, 415–16 (1990). Even if it *chose* to order restitution, it was not required to order restitution *in full*. It could instead order partial restitution for a slew of reasons, including "the financial needs and earning ability of the defendant." 18 U.S.C. § 3664(a) (1994 ed.); *see also id.* § 3553(c) (1994 ed.). When Congress passed the Act in 1996, however, it chose to make restitution mandatory in almost all cases. *Id.* § 3663A. And it chose to clarify that partial restitution would not do. Instead, a district court was required under the Act to "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). All in all, the provision's role was important but more modest than the government claims: to patch a potential "partial restitution" loophole in the new mandatory restitution regime.

The government next invokes *United States v. Jones*, 641 F.3d 706 (6th Cir. 2011), but that case hurts the government more than it helps. *Jones* held that a defendant may have to pay restitution for acquitted conduct. *See id.* at 714–15. We reiterated that we determine "the scope of the scheme" for restitution purposes by looking to "the indictment." *Id.* at 714. There, the indictment charged the defendant, a podiatrist, with engaging in a "scheme to defraud" Medicare and Medicaid for various "services and procedures . . . , when in fact he had not rendered any services or procedures," "[f]rom in or about December 1999, through in or about May 2006." Indictment ¶¶ 25–31, No. 08 Cr. 168 (N.D. Ohio, filed Apr. 9, 2008). At trial, the defendant was convicted of two counts of mail fraud—each one for a bill he sent—but acquitted of dozens of other charges. *Jones*, 641 F.3d at 709. At sentencing, the district court determined by a preponderance of the evidence that all bills submitted by the defendant to Medicare and Medicaid between 2001 and 2005 were fraudulent, including bills for which he had been

acquitted. *See id.* at 710. It thus ordered him to pay restitution for the full amount for the time covered by the indictment. *Id.*

There, as here, we looked to the indictment to determine whether particular conduct fell within or without the charged scheme. Because the defendant in *Jones* was convicted of an "offense that involves as an element a scheme"—mail fraud—he had to pay restitution for his "criminal conduct in the course of the scheme," not just the particular predicate act for which he was convicted. *Id.* at 714 (quoting 18 U.S.C. § 3663A(a)(2)). To define the scheme, we looked to the indictment, which depicted "a broad, over-arching plan" to "defraud Medicare and Medicaid" between 1999 and 2006. *Id.* "The scheme included not only the acts of which he was convicted," we explained, "but also the ones of which he was acquitted" that could be proven by a preponderance of the evidence. *Id. Jones* confirms that the indictment determines the scope of a restitution order.

So too for *United States v. Ellis*, 938 F.3d 757 (6th Cir. 2019). The defendant in that case was indicted (and convicted) for a scheme that "*[b]eg[an] no later than in or about* January 2012." Indictment ¶ 4, No. 16 Cr. 236 (M.D. Tenn., filed Nov. 30, 2016) (emphasis added). The district court found that the scheme had in fact begun in 2008 and awarded restitution accordingly. *See Ellis*, 938 F.3d at 763. On appeal, the defendant argued that the award was barred by the statute of limitations (which we rejected), but not that it was barred by the temporal scope of the indictment. The government nevertheless argues that *Ellis* approved of courts ordering restitution outside "the time of the alleged scheme." Appellee's Br. 44.

That is wrong twice over. *First*, "[c]ases implicating issues that merely lurk in the record, neither brought to the attention of the court nor ruled upon, do not establish binding precedent on the unexamined point." *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) (quotation omitted). Yes, a concurrence in *Ellis* noted the issue. But it proceeded to *disagree* with the government's position, noting that other circuits have held that restitution may not be sought "for losses occurring outside the dates identified in the indictment." *Ellis*, 938 F.3d at 765–66 (Stranch, J., concurring). *Second*, the (unexamined, undecided) issue in *Ellis* differs from today's issue. The indictment in this case did not allege that Gray's scheme to defraud began *no later than* 2015. Had it done so, the government might have left the door open to claim

that the conspiracy began in 2004.  It instead alleged that Gray and his wife, "[b]eginning in or about January 2015 and continuing to in or about August 2019 . . . conspired and agreed to lie to" Veterans Affairs.  R.1 at 1.  That distinction disposes of this case.  The statute does not allow restitution for conduct that falls outside of "the course of the . . . conspiracy."  18 U.S.C. § 3663A(a)(2).

True, as the government notes, it *could* omit dates from indictments altogether.  The "essence" of a conspiracy, after all, is the "who" (a "combination of minds") and the "what" ("an unlawful purpose"), not necessarily the "when."  *Smith v. United States*, 568 U.S. 106, 110 (2013) (quotation omitted).  But that does not make start dates or end dates gratuitous.  An indictment must provide the defendant fair notice of the charge against him.  *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108–09 (2007).  There is no one way to accomplish that goal:  An indictment might name a defendant's coconspirators ("to rob banks with John Doe and Jane Jones"), list a set of addresses ("to rob banks at 123 First St and 456 Second St"), describe the conspiracy's goals and techniques ("to rob banks of their gold bars"), or, as here, clarify the conspiracy's start and end ("to rob banks from 2020 to 2024").  However the government chooses to meet its obligation of putting a defendant on notice of the charges against him, it may not complain when the courts hold it to its word with respect to a restitution order.

The government claims that plain error "arguably" applies because Gray did not directly raise the issue below.  Appellee's Br. 39.  The ambivalence is warranted.  Gray did raise the issue but not as forcefully as he could have.  In his sentencing brief, Gray argued that it would be "inappropriate[]" for the district court to award restitution for "supposed 'losses' going back to 2004" when the indictment "alleged a January 2015 start date for *any* illegal conduct."  R.128 at 12.  At the sentencing hearing, he reiterated his request that the court "look at the alleged overpayment amount for the time period covered by the indictment."  R.158 at 38.

The trial court at all events addressed the issue.  "[T]here can be no forfeiture where the district court . . . addressed the merits of the issue."  *United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011) (quotation omitted); *see also Cartwright v. United States*, 12 F.4th 572, 580 n.6 (6th Cir. 2021).  In its restitution ruling, the district court expressly considered (and rejected) the

argument that "anything before the first date specified in the conspiracy charge" is "off limits." R.158 at 41. In doing so, the district court cited *United States v. Ellis*, and noted "some caveats from the concurring judge"—an opinion singly focused on the permissibility of ordering restitution for conduct outside the temporal scope of the indictment. R.158 at 42. While it would have been helpful to the district court to have better briefing from both parties on the issue, it is properly before us.

For these reasons, we affirm in part, vacate in part, and remand for recalculation of the amount due in restitution.