NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0579n.06

No. 24-1838

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 15, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| ROMANE PORTER, | ) ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: CLAY, KETHLEDGE, and LARSEN, Circuit Judges.

**CLAY, Circuit Judge.** Following a trial, a jury convicted Romane Porter of one count of conspiracy to transport stolen vehicles in violation of 18 U.S.C. § 371 and three counts of transportation of stolen vehicles in violation of 18 U.S.C. § 2312. On appeal, Porter challenges: (1) the district court's denial of his motion for a new trial based on the government's admission of false evidence and testimony at trial, (2) the district court's calculation of amount of loss at sentencing, (3) the district court's calculation of restitution at sentencing, (4) the district court's application of a two-level aggravating role enhancement at sentencing, and (5) the district court's imposition of a forfeiture money judgment.

For the reasons set forth below, we **AFFIRM** the judgments of the district court.

## I. BACKGROUND

### A. Factual History

Following the discovery that Volkswagen employed "a cheat device that fooled regulators" into thinking that engines in certain vehicles complied with environmental regulations,

Volkswagen agreed in a settlement to buy back nearly 500,000 non-compliant vehicles. Tr. Vol. 3, R. 279, Page ID #2916. Volkswagen repurchased almost 500,000 vehicles from customers, and those vehicles were to be retitled in Volkswagen's name. Once Volkswagen took possession of the non-compliant vehicles, the vehicles were "not allowed to be reintroduced to commerce," and it was "illegal" for Volkswagen to sell those vehicles at the time. *Id.* at 2920; Tr. Vol. 2, R. 278, Page ID #2864.

As Volkswagen sought to retitle the vehicles and find a solution to fix and resell them eventually, Volkswagen stored 350,000 of these vehicles in lots throughout the United States, including the Silverdome stadium lot in Pontiac, Michigan. At any given time, Volkswagen stored over 10,000 vehicles at the Silverdome lot. Volkswagen contracted with Pasha, a "portside vehicle processor," to run the Silverdome lot by conducting inventory, storage, and maintenance for the vehicles. Tr. Vol. 3, R. 279, Page ID #2925-26. Private security constantly monitored the lot, which was surrounded by fencing and had only one operational point of entry. No advertisements, billboards, or other marketing indicated that the vehicles were for sale, and the public was not allowed to access the lot.

Daniel Onorati ("Onorati") worked as the on-site manager for Pasha, and he recorded, organized, and tracked the vehicles in the Silverdome lot. Allen Klusek ("Klusek") worked as a security guard at the main gate of the Silverdome lot, and he checked in employees and monitored the vehicles that entered. In 2017, Onorati approached Klusek about stealing vehicles from the Silverdome lot. Onorati's friend, Romane Porter ("Porter"), also participated in stealing the vehicles, but he had no affiliation with the Silverdome lot and no credentials to access the lot.

Onorati, Porter, Klusek, and others worked together to steal over 60 vehicles from the Silverdome lot. Onorati would set aside vehicles to be stolen from the lot. Porter and "his people"

would drive to the lot in Porter's vehicle. Tr. Vol. 5, R. 281, Page ID #3316, 3341. Klusek would grant Porter and his people access to the lot and direct them to the vehicles to be stolen. Porter usually remained in his own vehicle, and his people would drive the stolen vehicles off the lot. The group carried out this routine to steal vehicles approximately once per week and usually on the weekends. Marneice Bond ("Bond"), who was in a relationship with Porter, also participated in these trips to steal the vehicles on three occasions. GPS data demonstrated that Porter visited the Silverdome lot seventeen times while Klusek was working at the lot. Klusek testified unequivocally that he knew that the vehicles were being stolen.

Porter created fraudulent titles for the stolen vehicles and provided those fraudulent titles to other people when he sold the vehicles to them. Porter did not have any license that authorized him to sell cars. Claiming that he was affiliated with Volkswagen, Porter sold 46 or 47 stolen vehicles to an owner of an auto shop, Bert Williams ("Williams"). An auction house, Manheim, ultimately resold the vehicles that Williams purchased from Porter. Bond also purchased a stolen vehicle from Porter, and after the FBI approached her regarding the stolen vehicle, she asked Porter about it in a recorded phone call. Porter responded, "Ah, shit shit shit." Tr. Vol. 4, R. 280, Page ID #3076. People who purchased the stolen vehicles encountered significant issues with the vehicles, including: (1) the vehicles were not eligible for the Volkswagen buy-back program because the vehicles were "already paid out;" and (2) the titles associated with the vehicles were invalid. Tr. Vol. 8, R. 284, Page ID #3711-13.

Employees at Pasha and Volkswagen eventually discovered that vehicles were missing from the Silverdome lot and notified law enforcement. After discovering that Porter's name appeared on certain sales documents for the stolen vehicles, an executive at Volkswagen spoke

with Porter, and Porter explained that he had "somehow engaged in removing cars from the Silverdome" lot. Tr. Vol. 2, R. 278, Page ID #2872-74.

## B. Procedural History

The government charged Onorati, Klusek, and Porter with criminal offenses. Onorati pled guilty to conspiracy to sell or possess stolen vehicles in violation of 18 U.S.C. § § 371, 2313. Klusek pled guilty to conspiracy to sell or receive stolen vehicles in violation of 18 U.S.C. § § 371, 2313. And following a trial, a jury convicted Porter of one count of conspiracy to transport stolen vehicles in violation of 18 U.S.C. § 371 and three counts of transportation of stolen vehicles in violation of 18 U.S.C. § 2312.

Porter's trial featured testimony from nearly 20 witnesses, one of whom was Klusek. Porter filed a motion for a new trial, and in denying that motion, the district court declined to consider whether Porter was entitled to a new trial on the ground that the government admitted false evidence and testimony regarding Klusek's plea agreement at Porter's trial.

At sentencing, the district court calculated an amount of loss exceeding $550,000, which resulted in a 14-level increase to the offense level under U.S.S.G. § 2B1.1(b)(1)(H). The district court also ordered that Porter pay $672,060 in restitution to Volkswagen as compensation for the costs and fees incurred in recovering stolen vehicles from Manheim. Additionally, the district court applied a two-level aggravating role enhancement under U.S.S.G. § 3B1.1(c) at Porter's sentencing. The district court also issued a forfeiture money judgment of $380,000, representing Porter's criminal proceeds.

This appeal followed, wherein Porter challenges: (1) the district court's denial of his motion for a new trial based on the government's admission of false evidence and testimony at trial, (2) the district court's calculation of amount of loss at sentencing, (3) the district court's

calculation of restitution at sentencing, (4) the district court's application of a two-level aggravating role enhancement at sentencing, and (5) the district court's imposition of a forfeiture money judgment.

## II. DISCUSSION

### A. Motion for a New Trial

Porter argues that he is entitled to a new trial because, when Klusek testified at Porter's trial, the government purported to present a final version of Klusek's plea agreement as an exhibit, but actually presented a prior version of Klusek's plea agreement instead. Porter argues that this admission of false evidence by the government, in addition to Klusek's testimony regarding this false evidence, violated his due process rights, thereby warranting a new trial under Federal Rule of Civil Procedure 33.

#### 1. Preservation of the Issue

When "we hear an issue on appeal, we consider whether the issue was properly raised before the district court." *Kitchen v. Whitmer*, 106 F.4th 525, 536 (6th Cir. 2024) (citations and quotations omitted). Porter did not object to the admission of this exhibit at trial because he "trusted that the government was entering" the correct version of Klusek's plea agreement. Appellant's Br. at 24. Nor did Porter raise this issue in his timely motion for a new trial. Instead, Porter raised the issue for the first time in a supplemental brief in support of his motion for a new trial, two months after filing the motion. The district court declined to consider the issue in its order denying Porter's motion for a new trial because Porter raised the issue for the first time in an "unauthorized supplemental brief." Order, R. 321, Page ID #5056 n. 1.

Federal Rule of Criminal Procedure 33 provides that a "motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.

R. Crim. P. 33(b)(1). Such a motion "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." *Id.* at 33(b)(2). Untimely supplemental motions "do not relate back to timely filed motions." *United States v. Henning*, No. 98-3748, 1999 WL 1073687, at *2 (6th Cir. 1999) (citation omitted).

Porter argues that he timely raised the issue to the district court because it involves newly discovered evidence, and he raised the issue in his supplemental brief "as soon as he became aware of it." Appellant's Br. at 23. But if the defendant could have discovered evidence "through due diligence," the evidence is not "newly discovered." *United States v. Dailide*, 316 F.3d 611, 621 (6th Cir. 2003). Klusek's final plea agreement has been available on the public docket since June 24, 2022, well before Porter's trial. With due diligence, Porter could have viewed the final plea agreement on the public docket and discovered that the government presented at trial a prior version of Klusek's plea agreement instead of the final version. Therefore, this issue does not involve newly discovered evidence, and Porter needed to raise the issue in his timely motion for a new trial in order to raise it properly before the district court. *See United States v. Jones*, 364 F. App'x 205, 208 (6th Cir. 2010). But Porter did not do so, and his untimely supplemental brief does not relate back to his timely motion for a new trial. *See Henning*, 1999 WL 1073687, at *2.

The time limits in Rule 33 are mandatory claim-processing rules that must be enforced when properly invoked. *Eberhart v. United States*, 546 U.S. 12, 16 (2005). The government argues that Porter's false-evidence claim was untimely, thus invoking Rule 33; but it nonetheless asks us to review the claim for plain error, rather than dismiss the claim entirely. Since Rule 33's time limits do not affect our jurisdiction, we proceed accordingly. *See id.* at 19.

### 2. Standard of Review

We review issues not properly raised in the district court for plain error. Fed. R. Crim. P. 52(b); *see also United States v. Bashara*, 27 F.3d 1174, 1178 (6th Cir. 1994). To demonstrate a plain error, the defendant must show that (1) there is an error; (2) the error is "clear or obvious, rather than subject to reasonable dispute;" (3) the error "affected the outcome of the district court proceedings;" and (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (citations and quotations omitted).

### 3. Analysis

Under Federal Rule of Criminal Procedure 33(a), the court "may vacate any judgment and grant a new trial if the interest of justice so requires." This interest of justice standard "allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citations omitted). Motions for a new trial "are disfavored," *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000), and "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict," *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citation and quotations omitted). "The defendant bears the burden of proving that a new trial should be granted." *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

Porter argues that the government's admission of false evidence at trial and Klusek's testimony regarding this false evidence constituted a violation of Porter's due process rights and a substantial error warranting a new trial. To prove that the government's admission of false evidence violated due process rights, a defendant must show that: (1) the evidence "was actually

false;" (2) the evidence was "material;" and (3) the government "knew it was false." *Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009).

Porter shows that the government admitted false evidence at his trial. When Klusek testified at Porter's trial, the government presented Klusek with an exhibit and purported that the exhibit contained the final plea agreement that Klusek had signed. The exhibit presented by the government, however, contained a prior version of Klusek's plea agreement instead of the final version of Klusek's plea agreement. The prior version of Klusek's plea agreement included a different approximate loss amount and corresponding sentencing guideline range, as compared to the final version. The prior version of Klusek's plea agreement stated that the approximate loss amount was between $550,000 and $1,500,000, and the corresponding sentencing guideline range was between 30 and 37 months. The final version stated that the approximate loss amount was between $250,000 and $550,000, and the corresponding sentencing guideline range was between 24 and 30 months. Therefore, in presenting the prior version of Klusek's plea agreement and purporting that the document was Klusek's final plea agreement, the government presented false evidence at Porter's trial.

However, Porter fails to show that the government knowingly introduced the false evidence. Porter makes no argument as to why the government knew or should have known that the evidence was false besides the fact that the government had drafted and signed Klusek's plea agreement. Both Porter and the government contend that they did not realize that the exhibit presented by the government at Porter's trial was not the final version of Klusek's plea agreement. The government explains that it did not realize that the exhibit was not the final version of Klusek's plea agreement because the prior version was fully executed and appeared on its face to be a final agreement, Klusek and the government had finalized the plea agreement nearly five years before

Porter's trial, and the final version of Klusek's plea agreement remained sealed for a few years thereafter. Besides the differing loss amounts and sentencing guideline ranges, the two versions otherwise included the same or similar content, such that neither of the parties nor Klusek realized at the time of trial that the exhibit was not the final version of Klusek's plea agreement. Under these circumstances, Porter has not shown that the government knowingly introduced false evidence at his trial.

Nor has Porter shown that the false evidence is material. To demonstrate that the admission of false evidence is material, the defendant must show that there is "any reasonable likelihood" that the false evidence "could have affected the judgment of the jury." *Rosencrantz*, 568 F.3d at 584 (citations omitted). Notably, the government introduced the exhibit involving Klusek's plea agreement solely to inform the jury that Klusek was cooperating with the government and might receive a potential benefit for testifying at Porter's trial. The government's admission of Klusek's plea agreement and Klusek's testimony regarding his plea agreement at Porter's trial, therefore, was not to inform the jury of any substantive evidence against Porter.

Further, any false testimony from Klusek regarding his plea agreement at Porter's trial was minor. Although the exhibit presented by the government differed from the final version of Klusek's plea agreement in the stated loss amount and sentencing guideline range, Klusek's testimony at Porter's trial addressed only the sentencing guideline range in his plea agreement. When the government asked if Klusek read that his plea agreement stated a guideline range of 30 to 37 months, Klusek responded "Yes." Tr. Vol. 5, R. 281, Page ID #3301. That statement is the extent of Klusek's false testimony regarding his plea agreement. The government's questioning and Klusek's testimony at Porter's trial otherwise accurately reflected the final version of his plea agreement. Neither Klusek nor any party addressed the loss amount in Klusek's plea agreement

at Porter's trial, and Klusek's testimony did not include any other known falsehood. Moreover, Porter's trial featured several other witnesses and exhibits that implicated Porter in stealing the vehicles from the Silverdome lot, thereby corroborating Klusek's testimony regarding Porter's involvement in stealing the vehicles. Since Klusek's testimony featured only a brief acknowledgement of an inaccurate sentencing guideline range in his plea agreement, and, in any event, the jury was to consider Klusek's plea agreement only in that Klusek received a potential benefit for testifying at Porter's trial, there is no "reasonable likelihood" that the false evidence "could have affected the judgment of the jury." *Rosencrantz*, 568 F.3d at 584 (citations omitted).

Thus, Porter has not shown that a "substantial legal error occurred," *Munoz*, 605 F.3d at 373, or that this case features an "extraordinary circumstance where the evidence preponderates heavily against the verdict." *Hughes*, 505 F.3d at 593. Porter has thus not demonstrated an error—plain or otherwise. Accordingly, the district court properly denied Porter's motion for a new trial.

## B. Reasonableness of Sentence

Porter argues that the district court imposed a procedurally unreasonable sentence on three grounds: (1) the district court's calculation of the amount of loss, (2) the district court's calculation of restitution, and (3) the district court's application of the two-level aggravating role enhancement.

### 1. Standard of Review

We review the procedural reasonableness of a sentence for abuse of discretion. *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013). We "review the district court's factual findings for clear error and its legal conclusions *de novo*." *Id.* (citations omitted). A district court abuses its discretion at sentencing "when it relies on clearly erroneous findings of fact, when it improperly

applies the law, or uses an erroneous legal standard." *United States v. Histed*, 93 F.4th 948, 954 (6th Cir. 2024).

### 2. Analysis

#### a. Amount of Loss

Porter argues that the district court erred in finding that this case involves an amount of loss over $550,000, resulting in a 14-level increase to the offense level under U.S.S.G. § 2B1.1(b)(1)(H). We review "a district court's calculation of the amount of loss for clear error." *United States v. Mahbub*, 818 F.3d 213, 231 (6th Cir. 2016) (citing *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006)).

The sentencing guidelines allow a 14-level increase to an offense level if the loss exceeded $550,000. U.S.S.G. § 2B1.1(b)(1)(H). In determining the loss amount, the "court need only make a reasonable estimate of the loss," and "the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(B). The court may consider several factors, including the "fair market value" of the stolen property, the "cost of repairs" to damaged property, and the "approximate number of victims multiplied by the average loss to each victim." *Id.* "When determining the amount of loss for sentencing purposes, a defendant will be held accountable for the actual or intended loss to a victim, whichever is greater, or a combination thereof." *Mahbub*, 818 F.3d at 231 (citations and quotations omitted). The government must establish the amount of loss by a preponderance of the evidence, *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011), and if the amount of loss is supported by preponderance of the evidence, "the district court may use it in reaching the appropriate offense level." *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004). To challenge this calculation, the defendant "must 'carry the burden of

demonstrating that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations.'" *Mahbub*, 818 F.3d at 231 (quoting *Raithatha*, 385 F.3d at 1024).

The district court articulated several methods that supported its calculation of an amount of loss exceeding $550,000. The district court incorporated probation's findings that the "61 stolen vehicles had a Kelley Bluebook value of more than $1,000,000 at the time they were stolen," and 32 of the stolen vehicles that were recovered by Manheim "reported a total of $674,580.51 for fees related to the sale, repair[,] and transport of these vehicles" so "the loss exceeds $550,000, but [is] less than $1,500,000." Presentence Report at 9; *see also* Sent. Tr. Vol. 2, R. 338, Page ID #5604. The district court separately reasoned that the loss would exceed $550,000 if, instead of using the $674,580.51 figure provided by probation, the court considered "all the cars that were taken," which was "61 cars," and "priced all those vehicles at $10,500 per car." Sent. Tr. Vol. 2, R. 338, Page ID #5605. The district court also noted that it would arrive at a loss amount over $550,000 by considering that certain individuals lost approximately $380,000 as a result of the car-theft scheme, and that amount still does not include a number of vehicles purchased by Williams or the delivery charges for each vehicle. Additionally, the district court also considered a civil demand letter that Volkswagen sent to Pasha, requesting $674,580.51 for the recovery of 32 stolen vehicles, which would yield an amount of loss exceeding $550,000. In presenting that civil demand letter, the government had emphasized that, although Volkswagen wrote the letter in a separate litigation, the letter "was written contemporaneously" with the car-theft scheme in this case, and it properly "identifies a cost amount that Volkswagen had to pay to recover vehicles that [Porter] stole" from the Silverdome lot and "seeks a dollar amount for the recovery of at least 32 vehicles." Sent. Tr. Vol. 1, R. 337, Page ID #5539. With these various methods for reaching an amount of loss

exceeding $550,000 in this case, the district court made "a reasonable estimate of the loss," for which we afford "appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(B).

Porter offers multiple objections to the district court's calculation of amount of loss, none of which are availing. Porter objects to the district court's reasoning that the loss would exceed $550,000 by pricing each of the 61 stolen vehicles at $10,500 because certain vehicles were found at Porter's house and in the Silverdome parking lot. But the record shows that Porter helped steal over 60 vehicles from the Silverdome lot and that he sold the stolen vehicles to various individuals and an auto shop at a price of $10,000 per vehicle with a delivery charge of $500. Porter also argues that the $380,000 approximate loss to certain individuals falls short of an amount of loss exceeding $550,000, but in doing so, Porter ignores the fact that the district court understood that the amount did not yet reach $550,000 and reasoned that the amount includes only a portion of the vehicles that Porter actually stole and sold. Porter also objects to the district court's consideration of the civil demand letter from Volkswagen, arguing that the letter does not represent an accurate fair market value for the stolen vehicles. But that letter "was written contemporaneously" with the car-theft scheme in this case, and the value of the vehicles articulated in the letter constituted the actual amount that Volkswagen paid Manheim to reobtain the stolen vehicles. Sent. Tr. Vol. 1, R. 337, Page ID #5539. Porter further objects to the district court's calculation of the loss amount because the amount was higher than that of his codefendants, Klusek and Onorati, but "the government has no obligation to stipulate to identical loss amounts with co-conspirators." *United States v. Coker*, 514 F.3d 562, 569 (6th Cir. 2008) (citation omitted).

Porter has thus not demonstrated that "the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations." *See Mahbub*, 818 F.3d at 231.

Accordingly, the district court did not err in finding that the amount of loss in this case exceeded $550,000 under U.S.S.G. § 2B1.1(b)(1)(H).

### b. Restitution

Porter next argues that the district court erred in ordering Porter to pay a restitution amount of $672,060 to Volkswagen. We "review the amount of a restitution award for abuse of discretion." *United States v. Elson*, 577 F.3d 713, 725 (6th Cir. 2009) (quoting *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009)).

Restitution is mandatory for convictions of conspiracy to transport stolen vehicles under 18 U.S.C. § 371 and transportation of stolen vehicles under 18 U.S.C. § 2312, when "an identifiable victim" has suffered a "pecuniary loss." 18 U.S.C. §§ 3663A(c)(1)(A)(ii), (c)(1)(B). "Restitution 'is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction.'" *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015) (quoting *Hughey v. United States*, 495 U.S. 411, 416 (1990)). The defendant "must repay losses attributable to the" offense "but need pay no more" because although "district courts must make victims whole, they may not make victims more than whole with respect to the charged" offense. *United States v. Gray*, 121 F.4th 578, 588 (6th Cir. 2024). The district court need not calculate a victim's actual loss with "*exact* precision," but "*some* precision" is required. *Kilpatrick*, 798 F.3d at 388 (citations and quotations omitted). "The government bears the burden of proving a victim's actual loss by a preponderance of the evidence." *Id.* (citations omitted).

The district court ordered that Porter pay a restitution amount of $672,060 "to Volkswagen for repurchasing vehicles or to Pasha Automotive Services, if already paid by Manheim." Judgment, R. 326, Page ID #5144. At sentencing, the district court explained that this restitution amount covers the amount that Volkswagen paid to recover stolen vehicles from Manheim.

The district court limited this amount to the sale price, buy fee, and transportation reimbursement associated with Volkswagen recovering the stolen vehicles. The district court excluded the cost of repair bills, as it found those were unsupported. The district court thus stated that it ordered a restitution amount of "$674,580.51 minus $2,520.51," which comprised the total amount of loss incurred by Volkswagen in paying a sale price, buy fee, and transportation reimbursement to recover the stolen vehicles from Manheim. Sent. Tr. Vol. 2, R. 338, Page ID #5610. The district court also clarified at sentencing that Volkswagen should receive this amount for "buying back the vehicles from Manheim pursuant to [its] agreement with Pasha," but Volkswagen should not "get a windfall," so if Pasha already paid Volkswagen this amount, then Pasha should receive the amount. *Id.* at 5610.

Porter does not offer any compelling objection to the district court's ordering of this restitution amount. Porter argues that the amount of $672,060 was unsupported by evidence, but the record sufficiently supports that amount. The civil demand letter from Volkswagen states that Manheim initially paid $674,580.51 in fees and expenses "to recover and repurchase the stolen vehicles" from its customers who had purchased the vehicles, and then Volkswagen received the vehicles and reimbursed Manheim "the costs and fees incurred by Manheim to recover these vehicles" from customers. Appellant's App. at 28 (citation modified). The civil demand letter included a spreadsheet that provided the VIN, sale date, sale price, buy fee, transport reimbursement, repair bills, and total expense associated with 32 stolen vehicles that Volkswagen recovered from Manheim. A subsequent letter from counsel for Volkswagen confirmed that Volkswagen paid Manheim $674,580.51 to recover the stolen vehicles. That letter also stated that Volkswagen was unable to confirm at the time whether Pasha had reimbursed Volkswagen any portion of the amount that Volkswagen had paid to Manheim. The evidence thus supports that

either Volkswagen or Pasha incurred an actual loss of $674,580.51 as a result of "the conduct underlying the offense of [Porter's] conviction[s]." *See Kilpatrick*, 798 F.3d at 388. The district court was careful not to "make victims more than whole with respect to the charged" offenses, *see Gray*, 121 F.4th at 588, by ensuring that Volkswagen would not "get a windfall." Sent. Tr. Vol. 2, R. 338, Page ID #5610. Further, the district court used "*some* precision" in calculating the actual loss, *see Kilpatrick*, 798 F.3d at 388, as the district court considered the total amount of $674,580.51 and subtracted $2,520.51 in repair bills, finding that only the sale price, buy fee, and transportation reimbursement for the 32 stolen vehicles were sufficiently supported by evidence. The district court thus did not err in ordering that Porter pay a restitution amount of $672,060 to Volkswagen, or if Volkswagen had already been reimbursed, to Pasha, for the recovery of 32 vehicles that Porter stole.

### c. Aggravating Role Enhancement

Porter next argues that the district court erred in applying the two-level aggravating role enhancement under U.S.S.G. § 3B1.1(c) at his sentencing. We "review a district court's decision to grant a leadership enhancement under § 3B1.1 deferentially because it raises a fact-intensive question." *United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023) (citations and quotations omitted).

The sentencing guidelines allow a two-level sentencing enhancement if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving one or more participants. U.S.S.G. § 3B1.1(c) cmt. n.2. To qualify as a "participant," a person must be criminally responsible for the offense, but need not have been convicted. *Id.* at cmt. n.1. A defendant qualifies for this "enhancement if the district court concludes that he has exercised decision-making authority, recruited accomplices, received a larger share of the profits, was

instrumental in the planning phase of the criminal venture, or exercised control or authority over at least one accomplice." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *United States v. Lalonde*, 509 F.3d 750, 765-66 (6th Cir. 2007)) (citation modified). "Importantly, a district court need not find each factor in order to warrant an enhancement." *Minter*, 80 F.4th at 758 (citations and quotations omitted). "The government bears the burden of proving that the enhancement applies by a preponderance of the evidence." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (citation omitted).

At sentencing, the district court found that the two-level enhancement applied and articulated a factual basis supported by the record. The district court stated that "there are a number of people involved" in the criminal activity, including "Bond," "the people that [Porter] drove to the Silverdome to get the vehicles," "Onorati," and also "Klusek," whom "it could be argued" that "Porter supervised or led." Sent. Tr. Vol. 2, R. 338, Page ID #5606-07. The district court emphasized that Porter visited the Silverdome lot "on several occasions to get these cars," drove people to the lot "to take the cars," and arranged for the vehicles "to go to a place to stay until they could be picked up by haulers who took them to various places." *Id.* at 5607. The district court further highlighted that Porter "arranged for the sale" of the stolen vehicles to other people and "received the money" for the vehicles. *Id.* Moreover, the district court noted that Porter "also created false titles" associated with the stolen vehicles. *Id.* In doing so, the district court conveyed that multiple factors under *Vasquez* are satisfied in this case: Porter exercised decision-making authority, recruited other people to participate in the criminal activity, received a larger share of the profits, and arguably exercised control or authority over at least one accomplice. *See* 560 F.3d at 473.

Porter objects to the application of the two-level enhancement because the district court did not find that Porter managed or supervised either of his co-defendants. But the district court did acknowledge that "it could be argued" that "Porter supervised or led" Klusek. Sent. Tr. Vol. 2, R. 338, Page ID #5607. And, in any event, the district court "need not find each factor in order to warrant an enhancement." *Minter*, 80 F.4th at 758.

Porter also objects to the district court's finding of at least one participant, arguing that the district court "agreed that the people [whom Porter] brought to the lot with him may not have known they were doing anything wrong" because no evidence shows that Bond or the people that Porter brought to the lot were aware that Porter did not have authority to take the vehicles. Appellant's Br. at 33. But the record does not support this contention. At sentencing, the district court stated that Porter's "counsel claims that there's no proof that they knew they were engaged in wrongdoing by taking these vehicles off the Silverdome lot" but "it does not appear to me that that would necessarily be the case for all of them." Sent. Tr. Vol. 2, R. 338, Page ID #5612.

Additionally, Porter objects because the district court used the phrase "otherwise extensive," and such language does not appear in the two-level enhancement under § 3B1.1(c). Although the district court did use the phrase "otherwise extensive" at sentencing and that phrase does not appear in the language of the two-level enhancement, the district court clearly stated that the two-level enhancement applied in this case and articulated a sufficient factual basis. *See* Sent. Tr. Vol. 2, R. 338, Page ID #5606-07. The record supported the district court's finding that Porter was an organizer, leader, manager, or supervisor in criminal activity involving at least one participant. *See* U.S.S.G. § 3B1.1(c) cmt. n.2. Especially since we "review a district court's decision to grant a leadership enhancement under § 3B1.1 deferentially," the district court did not

err in applying the two-level aggravating role enhancement at Porter's sentencing. *See Minter*, 80 F.4th at 758.

## C. Forfeiture Money Judgment

Porter argues that the district court's forfeiture money judgment of $380,000 constitutes an excessive fine in violation of the Eighth Amendment.

### 1. Standard of Review

We review the question of whether a punitive forfeiture violates the Eighth Amendment *de novo*. *United States v. Bajakajian*, 524 U.S. 321, 336 (1998). The government "must prove forfeiture by a preponderance of the evidence." *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007) (citation omitted).

### 2. Analysis

If the government "include[s] notice of the forfeiture in the indictment," and "the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." *United States v. Hampton*, 732 F.3d 687, 690 (6th Cir. 2013) (quoting 28 U.S.C. § 2461(c)).

In this case, the government included notice of the forfeiture in both the original indictment and the first superseding indictment, and Porter was convicted of the offense giving rise to the forfeiture. Therefore, 28 U.S.C. § 2461(c) compelled the district court to order the forfeiture of property as part of Porter's sentence. *See id.*

A punitive forfeiture violates the Eighth Amendment if "it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. In evaluating whether a forfeiture was grossly disproportional to the gravity of the offense, we consider factors such as "the nature of the offense, the connection to other illegal activities, the source and likely use of the funds,

whether [the defendant's] conduct fit[s] into the class the statute was designed to cover," and "the potential fine under the advisory guideline range." *United States v. Ely*, 468 F.3d 399, 403 (6th Cir. 2006).

A court may impose up to a $250,000 fine for a conviction of a felony offense. 18 U.S.C. § 3571(b)(3). In this case, probation calculated a guideline fine range of $25,000 and $250,000 for each conviction of Porter's charged felony offenses. Porter concedes that such guidelines allowed the district court to impose a fine of $250,000 for each of his convictions, and since Porter was convicted of four counts of felony offenses, the district court could have imposed a fine of up to $1,000,000 at Porter's sentencing.

The record provides further support that the $380,000 amount was not grossly disproportional to the gravity of Porter's offenses. In a series of recurring trips to the Silverdome lot, Porter worked with Onorati, Klusek, and others to steal over 60 vehicles. Such conduct is precisely the sort of conduct that 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 2312 (Transportation of Stolen Vehicles) are designed to cover. And Porter's involvement in illegal activity did not stop there. Upon stealing the vehicles, Porter created fraudulent titles for the stolen vehicles. Then, despite not having any license that authorized him to sell vehicles, Porter sold the stolen vehicles to other people and provided those fraudulent titles with the vehicles. At Porter's trial, Bond testified that she gave Porter $10,000 after trading in one of Porter's stolen vehicles, and two witnesses testified that they each paid $10,000 for a stolen vehicle. Williams testified that his auto shop purchased 46 or 47 stolen vehicles from Porter and paid $10,000 for each vehicle and $500 for delivery of each vehicle. Records of a bank account associated with Porter reflected that he received at least $354,484.50 in wire transfers following the sale of the vehicles.

Under these circumstances, the district court's imposition of a forfeiture money judgment of $380,000 at Porter's sentencing was not an excessive fine in violation of the Eighth Amendment.

## III.   CONCLUSION

For the reasons set forth above, this Court **AFFIRMS** the judgments of the district court.